Dudley *vs.* Mallery—Mallery *vs.* Dudley.

No. 5.—MARIA S. MALLERY and HORACE MALLERY, plaintiffs in error, *vs.* WALTER S. DUDLEY and RINALDO P. DUDLEY, by their Guardian ad litem, ADAM AMAKER, defendant in error.

WALTER S. DUDLEY and RINALDO P. DUDLEY, by their next friend, &c., plaintiffs in error, *vs.* HORACE MALLERY and MARIA S. MALLERY, defendants in error.

These two writs of error being sued out to the same decision in the Court below, were considered together.

[1.] After a Demurrer to the whole of a Bill has been argued and alllowed, the Bill is out of Court, and therefore cannot be regularly amended; but where a Demurrer leaves any part of the Bill untouched, the whole may be amended, notwithstanding the allowance of the Demurrer.

[2.] The Courts in this country, favoring the intention of the party to the Instrument, particularly in the disposition of personal property, take hold of any words, to qualify or explain the technical terms which otherwise would create an estate tail; as a gift to M. S. D., for and during the natural life of her husband W. J. D., then in trust to and for the only use, benefit, and behoof of the *child* or *children* of the said M. S. D. who may be *living* at the time of her death, if more than one, then to be *divided* among them *share and share alike*, to him, her or them, his, her, or their *executors, administrators,* and *assigns,* forever, are words of *purchase.*

[3.] M. D. made a conveyance in these words, "and if it should happen, that the said M. S. D. should depart this life *leaving* no child or children by her said husband, then in trust for the maintenance and support of the said W. J. D. and his children." W. J. D., the husband, died before his wife—*Held* that the fee to the property never *vested* in W. J. D.

[4.] Where there is an *express* estate created by the instrument, it cannot be *implied* that a different estate was *intended.* Is not the doctrine of *implied estates* applicable to *Wills* only, and not to *Deeds?* *Quere.*

[5.] An instrument, having the requisites of a *deed,* but couched in the following language: "Then the said negroes to revert back to me, the said M. D. (the Donor) and *after my death,* to be divided share and share alike between my two grand-sons, Walter S. and Rinaldo P. Dudley," is a *testamentary paper.*

[6.] To give jurisdiction to a Court of Equity, it is not sufficient to state merely; that the slaves sued for, are the property of the Complainant, and the possession is withheld from the rightful owner; some special reason should be stated in the Bill, showing that the Complainant is entitled to a *specific delivery* of the slaves.

In Equity.   In Effingham Superior Court.   Decision on Demurrer, by Judge FLEMING.

The facts of this case and the points decided by the Court below, are fully set forth in the opinion of the Court.

CHARLTON & OWENS, for W. S. and R. P. Dudley.

The following is a summary of the points made by the argument for Complainants :

1st. As to the points excepted to by Complainants—

His Honor erred in deciding, that the interest that W. S. and R. P. Dudley took in the slaves mentioned in the Bill, was acquired by them, under *a will* of Mrs. Dudley, and not *a deed.* This instrument is admitted to be a deed, as to some of its provisions. It ought to be *clearly* shown, that a present interest ever got back to the donor, before it can be considered a will.   The contingent, equitable life interest, which the Donor declared she should have, *if* she were living after the determination of the particular estate, and *if* she survived W. J. D., was not a *reversion.*   A reversion is created by *law, (*2 *Thomas' Coke,* top *page* 166, *note* o.  4 *Kent,* 3*d ed.* 354.*)*   This interest is created by *deed,* and was a *shifting use.*  (4 *Kent,* 296.)   Upon the contingency happening, the Donor's interest was *equitable and for life,* the *legal* estate being in the Trustees, and the *fee* vesting in the subsequent grantees.   This paper was *never* a will ; it was a deed, *ab initio—ab ovo usque ad mala* ; a deed, creating a particular estate in Maria S. Dudley, and upon that, limited several fees, not mounted one upon another, but contingent remainders or uses, with double aspects. (4 *Kent* 199, 201.)

2d. As to the points excepted to by the defendant.

I. As to the first ground of Demurrer, we had the right to inquire of defendant as to their marriage. 1 *Daniell Ch. Pr.* 635.  If not, we had the right to amend.   *Story Eq. Pl.* § 459.

II. Maria S. Dudley did not take an absolute fee.   She certainly did not by the words of the deed.   It will hardly be doubted at this day, that there may be granted, by a *future use* or *executory* devise, a further estate, *after* an estate of inheritance.— 4 *Kent, (*3*d ed.)* 199.   2 *Bl. cap. XX,* 333.   *Hill vs. Hill, Dudl. Eq.* 71.   And where the prior fee is contingent, even a *remainder* may be created, to vest in the event of the first estate never taking effect, not to *succeed,* but as *collateral* to the contingent fee.— Such is this case.   4 *Kent,* 199.

The rule in Shelley's case does not apply here.   1st.  Because the interest of Maria S. Dudley was *equitable,* and that of her children would have been *legal.   Hays on real estate, Rule IV, (*7. *Law Lib. marg. p. 5.)*  2d. Because the rule never applies where the limitation over is to *"children;"* it must be *"heirs"* or *"heirs of the body."  Hays on real est.* 92, 108—9.  4 *Kent.* 215.  3d. The words "share and share alike," "their heirs, ex'rs, adm'rs and assigns," would in any event be sufficient to make them words of purchase.   *Doe vs. Lyde,* 1 *T. R.* 597.   *Doe vs. Laming,* 2 *Bur.* 110.   1 *Ld. Raym.* 203.   *Lemacks vs. Glover,* 1 *Rich. Eq.* 143, 4, 7, 8.

The rule in *Wild's* case does not apply.   That rule applies only where *lands* are devised to a person and his children, and he has no child at the time of the devise.   He then takes an estate tail, because the gift is *immediate;* but where the property is devised to A. *for life, and after his death* to his children, the rule does not apply.   *That* is a good legal *remainder.  Parkman vs. Bowdoin,* 1 *Sumner,* 363, '4, '5.   *Lemacks vs. Glover,* 1 *Richardson's Eq.* 144.

III.  W. J. Dudley did not take the fee.   The rule in *Wild's* case does not apply to him, because he and his children were to have only the *usufruct,* for "their maintenance and support," which, of course, would not be necessary after their death.   1 *Rich. Eq.* 144.   1 *Sumner,* 245.

But in reality, W. J. Dudley *took no estate at all;* he dying before the contingency happened, upon which he was to take.— 4 *Kent,* 205.

IV.  It is evident from the deed, that Maria S. Dudley never took a life estate.   *Vide Shep. Touch.* 445.   31 *Law Lib.* 306, *Note* 86.

V.  Equity will entertain a Bill for the specific delivery of slaves.   *Young vs. Burton,* 1 *McMullan Eq.* 255.   *Perry vs. Brunson,* 1 *Rich. Eq.* 79.

Having to come into Equity for discovery, the Court will retain jurisdiction and give relief.   1 *Story Eq. Jur.* 82, 89.   1 *Spear's Eq.* 587, 8, 594.   2 *Bailey,* 330.

HENRY & WARD, for H. and M. S. Mallery.

The following is a brief summary of the points made :

1st. As to the exception of Complainants to the decision of the Court. No other argument need be used, to convince the mind that the paper is testamentary as to Complainants, than a reference to its terms, and the decision of this Court in the case of *Hester, ex'r, &c. vs. Young*, 2 *Kelly*, 46.

But even admitting that the paper is a deed, the Complainants could take no title under it by way of shifting or springing use.— 1st. Because there is no trust specified in said instrument for them or for their use. 2d. Because an equitable estate tail vested in Maria S. Dudley, or a contingent, vested estate tail in remainder, became vested in William J. Dudley. *Wild's case.* 6 *Rep.* 17.— *Prince*, 246, 7. 3d. Because there is no use of any kind, raised for them by said instrument, and which is in derogation of some other estate, previously created by said instrument, or which is authorized to be created for their use, by some person clothed with a power for that purpose, upon which a shifting use can be raised. 4 *Kent*, 294, 6, 7, 8. 2 *Bl.* 334, 5. 4th. Because a good springing use, must be limited at once, independently of any preceding estate, and not by way of remainder; for then it becomes a contingent, and not a springing use, and subject to the same rule as contingent remainders. 4 *Kent*, 298.

2d. As to the exceptions of defendants—

I. His Honor should have sustained the first ground of Demurrer. *Story Eq. Pl.* §§ 521, 2, 579. 459. 2 *Atk.* 393. 2 *Vez. Sen.* 265. *Coop. Eq.* 257, 8. 2 *Bl.* 109, 10, 205.

II. Under the *Stat. Westm.* 2, "*de donis*," &c., and the rule in *Wild's case*, 6 *Rep.* 17, and the statute of Georgia, converting estates tail into absolute fees, Maria S. Dudley took an absolute fee in the property conveyed.

If Maria S. Dudley *had children at the time of the execution of the paper, or since, capable of taking*, the complainants would take nothing under the instrument. 2 *Burr.* 1100. *Doe vs. Perryer*, 3 *T. R.* 384. *Doe vs. Collins*, 4 *Ibid*, 294. 5 *Maule & S.* 98. 11 *East*, 668. 5 *B. & C.* 866. 7 *Taunt.* 362. 3 *Vez.* 289. 1 *Hill's Ch.* 322, 4, 58. 1 *Sumner*, 246, 51. 2 *Jarm. on Wills*, 73, *note* 84.

If the words had been, remainder over, " to the issue of said marriage, or to the heirs of her body," complainants could take nothing, the Rule in Shelley's case having applied. *Att'y Gen'l vs. Sutton*, 1 *P. W.* 756. 12 *Vez.* 88. *Hill on Trustees*, 241, 9. 1

*Hill's ch.* 38, 9, 268, 9, 70, 1.    1 *Kelly*, 402.    1 *Jarman*, 53, *n.*    2 *Ibid*, 241.

In the application of the Rule in Shelley's case, and in Wild's case, to equitable trust estates, Equity follows the law.    4 *Kent*, 25, *Garth vs. Baldwin*, 2 *Vez. Sen.* 646.    12 *Vez. Jr.* 89.    1 *Jarm.* 53, *n.*    2 *Ib.* 244, 5, 57, *n.*

Where real or personal property is bequeathed or conveyed *to a person and his child or children*, or *for life, and remainder to his child or children*, and the person has no child or children at the time of the execution of the instrument, *in esse*, and none, capable of taking in remainder, have since been born, *the words, in order to effectuate the intention of the donor, or testator, must be construed words of limitation.*    *Wild's case*, 6 *Rep.* 17.    2 *Jarm.* top page, 329.    *Mellish vs. Mellish*, 2 *B. & C.* 520, (9, *E. C. L. R.* 165.)    2 *B. & A.* 87, (22, *E. C. L.* 30.)    4 *B. & A.* 43, *Aspinwall vs. Andres et al.*7 *Man. & Gr.* 912 (49, *E. C. L.* 90.)    2 *B. & P.* 484.    1 *Sumner*, 236, 359.

III. William J. Dudley took an absolute fee.

A *vested* estate tail in remainder, became vested in him, in his life time, under the rule in Wild's case.    1 *P. W.* 563.    2 *At.* 616.    1 *Vez. Sen.* 46.    5 *Vez.* 207, 10.    9 *Ib.* 232.    10 *Ib.* 166, 171, 5.    1 *Bro. C.* 119, 181, 537.    3 *Ib.* 197.    7 *Metc.* 377.    1 *Hill S. C. Rep.* 358.    1 *Jarm.* 751, 76, 7.    2 *Atk.* 220.    2 *Wm. Bl.* 1083.    2 *Vern.* 545.    7 *Mod.* 439.    *Dougl.* 431, 430, 485.    15 *Pick.* 104.    7 *M. & W.* 292.

IV. Maria S. Dudley clearly took a life estate.    1st. Because any child or children (if she had one by W. J. D.) could not claim title until her death.    2d. Because the contingent remainder to W. J. Dudley, could not vest until her death.    1 *Jarm.* 464, *Upton vs. Ld. Ferris.*    5 *Vez.* 801.    18 *Ib.* 39.    4 *Bro. C.* 400, *n. a.* 3 *Ib.* 197.    1 *P. W.* 40, 472.

V. The mere fact of the property being *slaves*, will not authorize a specific delivery in equity.    2 *Story, sec.* 703.    1 *McC. Ch.* 56, 516.    1 *Bail.* 62, *and* 1 *McM.* 256, to the contrary notwithstanding.

*By the Court*—LUMPKIN, J., delivering the opinion.

M. S. Dudley and Rinaldo P. Dudley, infants under the age of twenty-one years, by their next friend and guardian, *ad. litem*,

Adam Amaker, all of the State of South Carolina, filed their Bill in Equity, in the Superior Court of the county of Effingham, and returnable to the October Term in the year one thousand eight hundred and forty six of said Court, and therein alleging, that in the month of May, in the year one thousand eight hundred and thirty-seven, Mary Dudley, of the State of South Carolina, made and executed a certain Bill of Sale, or conveyance, a copy of which was annexed, and is as follows:

"GEORGIA, EFFINGHAM COUNTY:

"Know all men by these presents, that I, Mary Dudley, of the State of South Carolina, in consideration of the natural love and affection which I have and bear to my daughter Maria S. Dudley, wife of Wm. J. Dudley, of the State and county aforesaid, and for and towards the better support and maintenance of her, after my decease, and for divers other good causes and considerations, me thereunto moving especially, have given, granted, and sold, and by these presents do give, grant, and sell unto James O. Goldwire, of the State and county aforesaid, Trustee for the said Maria S. Dudley, wife of the said Wm. J. Dudley, a negro man slave named Jim, between forty-five and fifty years of age; also a negro girl slave called Eliza, about four years of age, with her future issue and increase; and also, all the notes of hand and ready money, that I, the said Mary Dudley, may be possessed of at or on the day of my death, unto the said James O. Goldwire, his executors, administrators and assigns, in trust, to and for the only use, benefit, and behoof of the said Maria S. Dudley, for and during the natural life of her husband, W. J. Dudley, then in trust, to and for the only use, benefit and behoof of the child, or children of the said Maria S. Dudley, by her said husband, the said William J. Dudley, who may be living at the time of her death; if more than one, then to be divided among them, share and share alike, to him, her or them, his, her or their executors, administrators and assigns forever. And if it should happen, that the said Maria S. Dudley should depart this life, leaving no child or children by her said husband, then in trust, for the maintenance and support of the said William J. Dudley and his child or children, and should said Maria S. Dudley leave no children or child by her said husband, W. J. Dudley, to have and to hold the said negro man slave Jim, and the said negro girl slave Eliza, and her issue, during her widowhood; and should it so happen, that the said W. J. Dudley depart

this life, without a child or children, then the said negroes to re-
vert back to me, the said Mary Dudley, and after my death, to be
divided, share and share alike, between my two grandsons, Wal-
ter S. and Rinaldo P. Dudley; and I, the said Mary Dudley, do
hereby, for myself, my executors, administrators and assigns, war-
rant and defend the said negro man slave called Jim, and the said
negro slave called Eliza, unto the said James O. Goldwire, his ex-
ecutors, administrators, and assigns, against all, and any other
person or persons whatever. In witness whereof, I have hereunto
set my hand and seal, this (13) thirteenth day of May in the year
of our lord one thousand eight hundred and thirty-seven.
Signed, sealed, and delivered

    in the presence of                    MARY DUDLEY, [L. S.]
Jos. HITCHCOCK, B. C. PORTER.

This instrument was duly recorded in Effingham county, upon
the following affidavit of one of the subscribing witnesses:

"Personally appeared Benjamin C. Porter, who being duly
sworn, on the Holy Evangelist, deposeth and says that he was
present, and did see Mrs. Mary Dudley sign, and execute, and
deliver the within instrument of writing, for the purposes therein
mentioned, and that Joseph Hitchcock with himself signed as
witness thereto.     [Signed.]                    B. C. PORTER.

Sworn to this 29th day of May, 1837.

    J. R. MORGAN, J. P.

The Bill further alleged, that the said Mary Dudley departed
this life before the said William J. Dudley, who hath since de-
ceased without leaving issue, and the said Maria hath since inter-
married with Horace Mallery, of the county of Effingham, and
State of Georgia; that the said Horace Mallery, and Maria his wife,
still retain and keep possession of the said slaves, and that the said
complainants had frequently applied to them to surrender said
slaves; that the said Horace and wife have in their possession, the
original bill of sale or conveyance, under which the complainants
claim title, and that they refuse either to deliver it up, or permit
the complainants to have access to it; and the said complainants af-
ter specifically interrogating the said Horace and his wife Maria S.,
to all and singular, the matters charged in the Bill, prayed that
the said defendants might be decreed to produce the said original
Bill of sale or conveyance, to surrender to complainants the said
slaves Jim and Eliza, or account for the same, and to pay to com-

plainants the hire of the slaves, since the intermarriage of the defendants, and for further and other relief.

To this Bill a Demurrer was filed, alleging the following grounds—First, Because no persons ought to be compelled to set forth or discover any matter or thing, which may subject him or her, to any pains, or penalties, or forfeiture whatsoever; and therefore, as the said complainant's Bill, on its face, seeks the discovery of a fact from the defendants, the discovery of which would subject them, (if true,) to a forfeiture of the estate sought to be recovered from them, they demur thereto.

*Second*, Because the said complainants have not made any such case, or set forth any such title, as will entitle them in a Court of Equity to any discovery from the defendants, or any relief against them.

After hearing argument upon the Demurrer, Judge Fleming declined expressing any opinion on the first ground, simply remarking that if he were to sustain it, he would allow complainants to amend their Bill, by striking out so much of it as seeks a discovery from the defendants, of their marriage.

Under the *second* head of Demurrer, various views were presented by the counsel for the defendants.  *First*, It was contended that Maria S. Dudley took an absolute fee to the negroes, either in her own right, or as the sole heir of her husband, William J. Dudley.   That if this were not so, that she took at least an estate during the term of her *natural life;* that if they were wrong in these positions, then they insisted that the *whole* instrument was a *will*, and if it were not, that portion of it, in favor of the complainants, was *testamentary.*   That if the conveyance be a deed, and not a will, and the complainants entitled to take as remainder-men, that their estate is either legal or equitable; if equitable, the trustee should have been made a party; if legal, they have a full and adequate remedy at law.

His Honor, Judge Fleming, overruled all of these grounds, except that the conveyance was *testamentary* in its character, as to the complainants; to which latter opinion the complainants excepted, and to all the rest the defendants excepted, so that we have, for the first time since the establishment of the Court, the novel spectacle, of two Bills of Exceptions, predicated on the same decision.

The Court below having determined to sustain the defendants

on another point, which would be fatal to the Bill, did not see fit to decide whether the complainants had the right to inquire of the defendants if they had not intermarried. There is, therefore, nothing for us to *review* in this behalf. We are inclined to think that the question was improperly propounded; still we are clear that the Bill might have been amended by striking out this interrogatory.

[1.] Where a Demurrer to the whole of a Bill has been argued and allowed, the Bill is out of Court, and therefore cannot be regularly amended. To avoid this consequence, the Courts will sometimes, instead of deciding upon the Demurrer, give the complainant liberty to amend his Bill, upon terms. But where the Demurrer leaves any part of the Bill untouched, the whole may be amended, notwithstanding the allowance of the Demurrer, for the suit in that case continues in court. *Story Eq. Pl.* §459. 3 *Mitf. Eq. Pl. by Jeremy,* 215, 216, *and cases there cited. Cooper's Eq. Pl.* 115. 11 *Ves.* 72.

Upon the proper construction of the conveyance made by old Mrs. Mary Dudley, our opinion will be very brief, notwithstanding it has elicited such an admirable exhibition of "complex and multifarious learning," by the erudite and ingenious counsel, who have conducted the argument. We have listened with patience and profound delight to a discussion, from which, it is not too much to say, my Lord Coke himself, were he in life, might derive both pleasure and profit. We lack the necessary time, had we the inclination and the ability, to be "raking in the ashes of antiquated cases," (whose name is *Legion,*) on this abstruse point of *Black-letter* lore.

In the interpretation of all instruments, the *intention* of the parties is to be the cardinal rule for our guidance, and when discovered, it will be executed, if it can be done consistently with the rules of law. And we see nothing to prevent every clause and provision of this conveyance from being carried into effect.

What was the object of the donor? To provide first for Maria S. Dudley during the life of her husband, and if she survived him, without children by him, then for her maintenance during her *widowhood;* if he survived her without children by her, then, in trust for the support of him, and any offspring that he might have by another wife. And all these contingencies failing, or events happening, then the negroes are to return to her, (which they would do of course by operation of law,) and she finally gives them,

*after her death*, to her grand children, the complainants in the Bill.

[2.] Under the rule in *Shelley's Case*, "that when the ancestor, by any gift or conveyance, taketh an estate of freehold, and in the same gift or conveyance an estate is limited, either mediately or immediately, to his heirs in fee, or in tail, *the heirs* are words of limitation and not words of purchase." *(1 Reports* 104 *;)* or in *Wild's case*, "that where *lands* are devised to a person and *his children*, and *he has no children at the time of the devise*, the parent takes an estate tail," *(6 Reports*, 17,*)* the words of this instrument might have been sufficient, unexplained, to have vested the fee to this property in Maria S. Dudley.    Still there are superadded terms *piled upon each other* here, which take the case out of the operation of the principle and doctrine of those rules.    The slaves are given in trust for the use and benefit of Maria S. Dudley, for and during the natural life of her husband; then in trust, to and for the use of the *child* or *children*, of the said Maria S. Dudley, by Wm. J. Dudley, " who may be *living at the time of her death, if more than one, then to be divided among them, share and share alike, to him, her, or them, his, her, or their executors, administrators, and assigns forever;*" "and should it so happen that the said Maria S. Dudley should depart this life, *leaving* no child or children by the said husband," &c.

It is palpable from these quintuple phrases, that the obvious intent of the conveyance, was to constitute in the descendants of Maria S. Dudley a new stock of inheritance, and not that the issue of the daughter-in-law should take as heirs by descent and successively.    And innumerable cases could be cited to show, that each set of these phrases, and even words of much weaker import had been seized upon by the Courts, to establish the intention, that the parties should take as *purchasers*, and not as *heirs* in the technical sense of that term.

It is true, that in some late cases in England, commented on by Jarman, *(2 Jarman on Wills*, 275,*)* the Courts in that country seem disposed to re-establish the original rules, in all of their stringency, and to hold that no *after words* shall do away with the force and effect of the technical language, used in the instrument, especially where there is an intermediate estate, or a limitation over created. Such, however, was not the doctrine promulgated in the great case of *Perrin and Blake, (Hargrave's Law Tracts,* 501,*)* nor held at Westminster Hall, at and before the period of our revolution, when

we adopted the common law with the construction of the British Courts upon it.

Mr. Justice Blackstone, in delivering judgment in Exchequer in *Perrin vs. Blake,* states, that all the cases that had occurred from the statute of Wills to that time, (a period of about two centuries) in which *heirs of the body* had been construed to be words of purchase, were reducible to these four heads ; either where no estate of freehold is given to the ancestor ; or where no estate of inheritance is given to the heir ; *or where other explanatory words are immediately subjoined to the former,* or lastly, where a new inheritance is grafted on the heirs of the body ; none of which, he adds, was the case then before the Court; *but one of which,* we may add, is the present case.

In support of the proposition here laid down, I would refer to *Perrin and Blake,* 4 *Burr.* 2579. *Atkinson vs. Hutchinson,* 3 *P. Wms.* 258. 2 *Eq. Ca. Abr.* 294. *Nichols vs. Cooper,* 1 *P. Wms.* 198. 4 *Brown, Ch. Cas.* 542. *Pinbury rvs. Elkin,* 1 *P. Wms.* 563. *Payne vs. Stratton, cited in* 2 *Atkins,* 647. *Doe vs. Lyde,* 1 *Dunf. and East,* 591. *Doe vs Laming,* 2 *Burr.* 1100. *Luddington vs. Kine,* 1 *Ld. Raym.* 203. *Blackhouse vs. Wells,* 1 *Eq. Cas. Abr.* 184. *King vs. Willing,* 1 *Vent.* 231. *Love vs. Davis,* 2 *Lord Raym.* 1561.

Retrogression as to this doctrine, may comport with public policy in the mother country, where estates tail are *lawful,* if not encouraged. The reverse, however, is true here, where estates tail have been abolished for more than half a century, and where every presumption is against the intention of the party, to violate the law, by attempting to create them.

" There are several cases," says Chancellor Kent, " in a devise, in which the words *heirs* or *heirs of the body,* have been taken to be words of *purchase,* and not of *limitation,* in opposition to the rule in Shelley's case—1, where no estate of freehold is devised to the ancestor, or he is dead at the time of the devise; 2, where the testator annexes words of explanation *to the* word *heirs;* as to the *heirs* of A. *now living,* showing thereby, that he meant by the word heirs, a mere *descriptio personarum,* or specific designation of certain individuals. In such cases it appears, that the testator intended the heirs to be the root of a new inheritance, or the stock of a new descent; and the denomination of heirs of the body is merely descriptive of the persons intended to take. 4 *Kent,* 221.

Mr. Reeve, after reviewing the cases on this point, thus concludes : "From the foregoing authorities, it is considered as demonstrated, that a strict legal construction, or a technical sense of any words, should not prevail against the superior force of intention apparent on the instrument. Whenever, then, the matter becomes certain, that the term *heirs* is used with the intent that they should take as purchasers, it is contended that the instrument should be so construed." And he refers to Justice Buller's argument, in the case of *Hodgson vs. Ambrose,* reported in *Douglass.* "For such an intention," says he, "is consistent with the rules of law ; and such estate might be given without the infringement of any rule." Of this opinion was Lord Hardwicke in *Bagshaw vs. Spencer,* Lord Mansfield in *Perrin and Blake;* Justices *Aston and Willes,* same case : Sir Joshua Jekyll in *Papillon vs. Voice,* reported in *P. Williams;* Ch. Justice DeGrey and Baron Smythe in the case of *Perrin vs. Blake,* in the Exchequer chamber; together with many other distinguished characters." *Reeve's Dom. Relat.* 465. See also 2 *Dall.* 244. 6 *Peters',* 68. 1 *Hen. and Munf.* 240. *Dev. Eq. Rep.* 189. 1 *Bailey,* 119. 6 *Yerger,* 96. 4 *Stewart and Porter.*

We recognise then the rules in Shelley's and Wilde's cases, as the settled principles of the common law, brought to this country by our ancestors, adopted by our state Legislature, and that whatever may be the feudal reasons, in which they originated, and which have ceased to exist, they must continue to be a portion of the public law, until abrogated by statutory enactment; still we are not willing to take the retrograde step which is indicated by the late decisions to which we have alluded. We are admonished against this, from a perfect conviction that the effect of these rules, with the relaxations from a rigid adherence to them, recognized in this country, operate in numerous cases of great hardship, to defeat the intention of parties.

Had an estate tail been created by this instrument, our statute would have vested the fee in Maria S. Dudley; our opinion is that no such estate was created. ·

[3.] But it is said, that, admitting the fee did not vest in Maria S. Dudley, as the first taker under the clause in favor of her and her child or children, that the fee, under the rule in Wilde's case, vested certainly in William J. Dudley; and that he dying without children, and intestate, she succeeded to the inheritance as heir at law.

What estate William J. Dudley would have taken, had he *survived* his wife, whether the usufruct for life, or the fee in this property, it is needless to determine.   Whatever estate he would have taken, was limited upon the  event of his  wife's  dying without children *before him.*   But she survived him.   He being dead, then, when the particular estate  terminated, and the estate given to him being upon the contingency of his surviving her, the reversion in fee vested in the grantor, and not in him, or any one claiming under him.   The whole instrument taken together, shows, as we think, most obviously, that it was the intention of old Mrs. Dudley, that the *vesting* should be postponed, and not the *actual possession* only.   1 *Jarm. on Wills*, 770.   7 *Metcalf's Rep*. 363, 378.

[4.]  But it is argued by counsel for the defendants below, that if they are wrong in the  foregoing positions, that Mrs. Mallery took an estate in the negroes, at least for and during the term of her natural life, by *implication.*

Estates by *implication* are restricted probably to *Wills.*   At any rate, I can find no reported case *under deeds*.   They are sustainable only upon the principle of carrying into effect the intention of the testator.   And unless it appears, upon an examination of the whole instrument, that such must have been the intention, there is no bequest by implication.   Besides, an implication may be rebutted by a contrary implication, which is equally strong.— 3 *Paige*, 9.   4 *Bro. Ch. Cas.* 534, 535.   13 *Pick.* 159.   23 *Pick.* 293, 294.   2 *Jarman on Wills*, 464, 465.

Now, without assigning any other reason against the ground here taken, it is perhaps quite enough to say, that by the instrument, it will be perceived that Maria S. Dudley takes an estate in the slaves *during widowhood*, in the event of surviving her husband, without children by him—the very facts now existing.   How then can she take an estate by *implication*, during the term of her natural life ?   Would not such a construction involve a manifest absurdity ?

[5.]  Is this paper then, a *deed* or *a will ?*   It is wholly unnecessary to express any opinion upon the *entire* instrument, or any other portion of it, except the clause which disposes of the reversion to the complainants.   For if the views we have already taken be well founded, all other interests have ceased, whether it be the one or the other.

We concur, however, in the judgment below, that it is a will as

to the notes, and ready money, and the interest of the complain-ants and a deed for all other purposes.

The *trust* created by the instrument ceased, or was executed, to speak with more technical precision, at the death of William J. Dudley. Maria S. Dudley, his wife, then took an estate for life in the slaves defeasible by her marriage. Upon the happening of that event, the property reverted to the donor, who has given the same to her grand-sons, the complainants, not *in presenti, but af-ter her death.* No present interest passed to them. And this it was competent for her to do, either by the same or a separate in-strument. A reversion may be disposed of by deed or will. This branch of the case is controlled by the decision in *Hester and Young,* made at this place twelve months since, *(2 Kelly,* 46,*)* and is dis-tinguished from the two cases determined at Milledgeville, in November last of *Cumming vs. Ware,* and *Jackson et al vs. Cul-pepper,* in this, that there a present interest vested, but a life es-tate or use was reserved, whereas, here nothing is given until *af-ter the death* of the donor.

[6.] It only remains to notice one other point in the pleadings. His Honor, the presiding judge, held in accordance with the re-cent S. Carolina cases, that a Bill well lies in a court of Equity for the specific delivery of slaves, which are withheld from the possession of the rightful owner, and that it is sufficient to give jurisdiction to the Court, to state in such Bills that the slaves are the property of the complainant, and that their possession is with-held by the defendant.

We yield our unqualified approval of the motive which has prompted these adjudications, namely, humanity to the slave, the interest of the owner, and a just regard to the ties which bind the master and slave together. Those who are acquainted with this institution, know, that the master and slave form one family, or social compact, being usually reared together on the same lot or plantation, and feeling toward each other the kindest sympa-thies of our nature. And notwithstanding a distinguished states-man at the North has predicted that in case of war, the South would become the Flanders of America, the history of the last two wars, and of the last seventy years, commencing with Lord Dunmore's fruitless attempt to stir up a servile insurrection in Virginia, falsifies this opinion. No subordinate class in the world entertain the same strength of attachment toward their superiors.

And this feeling is to a great extent reciprocated. The very strength and security of the South consists in the loyalty of our negro population to their owners.

Instead of weakening, our desire is to maintain and promote this mutual attachment and good will. But we cannot, for the very reasons assigned in these cases, go to the extent of holding that it is sufficient merely to allege in the Bill, that the slaves sought to be recovered are the property of the complainant, and withheld by the defendant. In many, I am prepared to say from my own experience, in a majority of the suits instituted for the recovery of slaves, humanity to both races requires that there should not be a *specific delivery.* And the very case under consideration illustrates the truth of this assertion. By reference to the conveyance, it will be seen that Eliza, one of the slaves sued for, was only four years old at its date, in 1837. She is, consequently, now, fifteen. She knows no other mistress but Mrs. Mallery, who has reared her from infancy. It is true that Mrs. Mallery is not, in the eloquent and emphatic language of my young Brother, who argued this cause for the complainants, " *of the blood*" of the donor, still, in point of fact, she occupies a nearer relationship toward this girl, than the complainants do, who are lineally descended from old Mrs. Dudley. Besides, it is likely, that this slave has formed ties of a more tender character in the neighborhood where she resides, to sunder which, would be an act of flagrant cruelty.

Female slaves are sometimes pledged for the payment of loaned money, and the borrower returns after the lapse of many years, tenders payment and claims the right to redeem his property, which has multiplied to a numerous family; here, as it often happens, the best feelings of our nature are opposed to the legal or equitable right.

Slaves, then, being by our law, chattels, we think it best, that as a general rule, chancery should not entertain a Bill for their specific delivery. And that to give jurisdiction, it is necessary to charge and prove peculiar circumstances—as, that they are family servants, a carpenter, blacksmith, wagoner, hostler, &c. This will give the defendant an opportunity of stating in his answer the peculiar circumstances connected with his possession; and the special jury, under the direction of the Chancellor, will constitute a fit and proper tribunal, to pass upon the peculiar features of each

case, and to decree either a specific delivery of the property, or its equivalent in money.

And this is in conformity with the practice of the English Courts, from which ours is derived. There, a Bill will not lie for the specific recovery of chattels, unless where the remedy at law by damages, would be utterly inadequate, and leave the injured party in a state of irremediable loss. In all such cases, Courts of Equity will interfere, and grant full relief by requiring a specific delivery of the thing which is wrongfully withheld. 2 *Stor. Eq. Jur.* §709.

Thus, where the lord of the manor was entitled to an old altar piece, made of silver, and remarkable for a Greek inscription, and dedication to Hercules, it was decreed to be delivered up as a matter of curious antiquity which could not be replaced in value. *Somerset vs. Cookson*, 3 *P. Wms.* 390. So where an estate was held by the tenure of a horn, and a bill was brought to have it delivered up, it was held maintainable; for it constituted an essential muniment of his title. *Pusey vs. Pusey*. 1 *Vernon*, 273. The same principle applies to any other chattel, whose principal value consists in its antiquity; or in its being the production of some distinguished artist; or in being a family relic or ornament, or heir-loom; such, for instance, as ancient gems, medals, and coins; ancient statues and busts; paintings of old and distinguished masters; and even those of a modern date, having a peculiar distinction and value, such as family pictures and portraits and ornaments, and other things of a kindred nature. *Fells vs Read*, 3 *Ves. Jr.* 70. *Lloyd vs. Loaring*, 6 *Ves.* 773, 779. *Lowther vs. Lowther*, 13 *Ves.* 95. *Pearne vs. Lisle*, *Ambl.* 77. *Macclesfield vs. Davis*, 3 *Ves. and Bea.* 16, 17, 18. *Nutbrown vs. Thornton*, 10 *Ves.* 163. *Arundel vs. Phipps*, 10 *Ves.* 140, 148. *Cited Ibid.*

I would merely add that the act of 1821, *(Prince, 449,)* passed the more effectually to quiet and protect the possession of personal property, and to prevent taking possession thereof by fraud or violence, gives a summary remedy to re-possess owners of negroes, and other chattels, against adverse claimants, who have gotten hold of them by violence, seduction, or other unlawful means.