### Gaboury, next friend, vs. McGovern, executor.

[Blandford, J., being disqualified in this case, Judge Estes, of the Northeastern Circuit, was appointed to preside in his stead.]

1. A testator by the first item of this will provided for his burial. By the second item, he provided for the payment of his debts. By the third item, he provided for a home for his wife, during her natural life, and at her death, said property to revert to said estate, to be disposed of by his will as a part of the residue. By the fourth item, he gave an annuity of $200 to his wife out of the income of his estate, and declared that the provisions for his wife should be in lieu of dower. By the fifth item, he gave to his mother $100. By the sixth, he gave to his brother, Michael, his watch and chain. By the seventh, he gave $50 to the Catholic church in Columbus. By the eighth, he gave the proceeds of a note of $270, which he held against his brother, Bernard, to his executor, to be expended in the education of the eldest son, or the eldest surviving son, the lawful child of his said brother, if any, and if not, then for like education of the eldest surviving daughter of said brother. By the twelfth item, he appointed his uncle, John McCarty, his executor. The ninth, tenth and eleventh items were as follows:

"Item 9.—It is my will and purpose, likewise by this, my will, to secure to my dear daughter, Mary Ann Dolan, for the sole and separate use, benefit, enjoyment and behoof of herself and her lawful issue during her life, and not in any wise to be at the control or disposal of any husband she may have, or to be at all subject or liable to his debts, or for his debts, contracts or liabilities, all of my other property, of whatever kind or nature soever. And with this view, I give and bequeath all the residue of my estate, real and personal, including six tenements and the ground on which they stand (describing them, and also another tenement), including also all my other real estate not hereinbefore disposed of, and all my other personal property, bonds, notes, accounts, choses in action, claims or demands of any description whatever, I give and bequeath said residue to my said executor and to his successors, as my legal representatives, in trust nevertheless, and with the special confidence to have and to hold the same, and the proceeds of the same, when realized in money, to and for the sole and separate use,

benefit, enjoyment and behoof of my said beloved daughter and her lawful issue; said property and proceeds not in anywise to be controlled, or to be at the disposal of any husband she may have, or ever be or become subject to or liable for his debts, contracts or liabilites. I will and desire my executor, and his successors in said trust, to retain in his and their own hands the possession of said residue and its proceeds, at least until my said daughter shall arrive at full age, and control and manage the same, its rents, issues and profits according to their best judgment and discretion, for the best interest of my said daughter, and the preservation and enhancement of my estate; and whenever he shall deem it advisable for those purposes, before she arrives at age or afterwards, and she thereto gives her consent in writing, I hereby authorize and empower him or them, confirming said trust and confidence, to purchase other real property, or sell said residue or any portion thereof, and invest the proceeds thereof, as well as its rents, profits and issues, in other real estate, personal property or moneyed securities, taking titles thereto to himself, or themselves, as trustees aforesaid, with the like provisions for the sole and separate use, benefit, enjoyment and behoof of my said daughter and her issue, and not to be in the control or disposal of any husband she may have, or be subject to or liable for his debts, contracts or liabilities. It is also, further confirming said trust, my will and desire that, out of the income of said residue, my said executor defray the reasonable and proper charges and expenses for board, clothing, maintenance and education of my said daughter until she arrive at full age, and that said income, or a sufficiency thereof, shall afterwards be devoted to the support and comfort of herself and her issue during her life, and I do hereby appoint my said executor her guardian, with the trusts and confidences hereinbefore expressed, and with the request that he will place her, when she shall have arrived at a suitable age, at some respectable Catholic seminary to be educated.

"Item 10.—It is my desire that my executor will, from time to time, with as little delay as possible, and as they shall be realized by him, proceed to invest, and continue to invest, all of the cash means of my estate, and the income accruing therefrom for rents, interest, issues, profits, etc.,—all that shall not be needed to meet the exigencies of the bequests hereinbefore made and the current disbursements herein directed—in other real property, such as stores on Broad street, in said Columbus, yielding reasonable rents and profits, or in some moneyed securities bearing interest, taking titles thereto in trust as aforesaid, and with the like limitations for the sole, separate and independent use and enjoyment of my said daughter and her issue, and not to be at the disposal or

Gaboury, next friend, *vs.* McGovern, executor.

control of any future husband of hers, or liable for his debts, contracts or liabilities.

" Item 11.—Upon the event of the death of my said daughter without child or children, or the issue thereof surviving her, I desire my said executor, or legal representatives, to sell all said residue upon the best terms they can reduce the same to cash means, and from the proceeds thereof I give and bequeath to my dearly remembered mother, Bridget Dolan, one hundred dollars; to my brother, Bernard Dolan, three hundred dollars ($300)," (and to other brothers and sisters in proportions named):

*Held*, 1st, that the words, " lawful issue," when taken in connection with the explanatory superadded words used in this will, are words of purchase, and not of limitation.

2. That no estate tail was created by this will.

3. That a trust estate was vested in the executor, and hence in his executor, for the use, benefit and behoof of testator's daughter during her life.

4. That this estate to her was subject to be opened upon the birth of a child to her, to let in such child for a use, enjoyment, maintenance and support with its mother, during her life.

5. That upon the death of the mother without a child, or the issue thereof, living at her death, the whole estate would have gone over to testator's mother, brothers and sisters.

6. That having left a child living at her death, the limitation over was defeated, and the absolute, fee simple estate vested in the child.

7. That the trust in the executor of testator's executor became executed upon the death of testator's daughter leaving a living child.

8. That the son of testator's daughter takes the whole estate, not by inheritance from his mother, but by purchase, under the will of his grandfather, and a right of action having accrued to him at the death of his mother, he is entitled to the relief he seeks.

December 19, 1884.

Wills.   Estates.   Heirs.   Words and Phrases.   Rule in Shelly's Case.   Before Judge WILLIS.   Muscogee Superior Court.   May Term, 1884.

Reported in the decision.

GOETCHIUS & CHAPPELL; SMITH & RUSSELL, for plaintiff in error.

PEABODY & BRANNON, for defendant.

ESTES, Judge.

John McCarty Gaboury, an infant, under twenty-one years of age, by his next friend and father, Joseph A. Gaboury, filed his bill in equity in the superior court of the county of Muscogee, and returnable to the June term thereof, 1884, alleging therein that Hugh Dolan, of said county, died testate in 1857, leaving surviving him his wife, Catherine Dolan, and his infant daughter, Mary Ann Dolan, his only heirs at law. Thereafter, in the same year, his widow, Catherine Dolan, also died.

In 1876, Mary Ann Dolan became of age, and on the 27th day of December, 1876, intermarried with Joseph A. Gaboury, and in June, 1880, gave birth to John McCarty Gaboury, the complainant. Afterwards, to-wit, in 1883, the said Mary Ann died, leaving complainant her only child.

Hugh Dolan's will was duly probated in said county in 1857, and John McCarty qualified as executor, and took possession of the estate, consisting of real and personal property of the value of $50,000.

By the will, the residue, after paying certain special legacies, was to be held by the said McCarty for the benefit and support of the said Mary Ann and her child, or children, during her life.

The residue so held amounted to $50,000, and the executor assented to the legacy; and upon the decease of Mary Ann Gaboury, complainant became entitled to ask and receive of the executor the whole of said residuum.

In November, 1882, John McCarty died testate, and William McGovern qualified as executor in December, 1882, in said county, and took possession of his estate, to be duly administered, whereby said McGovern became liable to account, as executor of McCarty, to complainant, touching the management of the estate of Hugh Dolan, and to pay complainant the residuum, for which said McCarty became chargeable.

The bill prays for an account and settlement, and for general relief.

The writ of subpœna was issued and service perfected. At the May term, 1884 (being the appearance term), defendant, through his solicitors, Peabody & Brannon, demurred to the bill for the want of equity.

On June 27th, 1884, during said term, the court sustained the demurrer and dismissed the bill, to which ruling of the court the complainant excepted, and assigned the same for error.

The testator, Hugh Dolan, by the first item of his will, provided for his burial. By the second item, he provided for the payment of his debts. By the third item, he provided for a home for his wife during her natural life, and at her death, said property to revert to his estate, to be disposed of by his will as part of the residue. By the fourth item, he gave an annuity of $200 to his wife out of the income of his estate, and declared that the provisions for his wife should be in lieu of dower. By the fifth item he gave to his mother $100. By the sixth, he gave to his brother, Michael, his watch and chain. By the seventh, he gave $50 to the Catholic church in Columbus. By the eighth, he gave the proceeds of a note of $270, which he held against his brother, Bernard, to his executor, to be expended in the education of the eldest son, or the eldest surviving son, the lawful child of his said brother, if any, and if not, then for like education of the eldest surviving daughter of said brother. By the twelfth item, he appointed his uncle, John McCarty, his executor.

I have thus called attention to these several items of his will in order that the purpose and scheme of testator may be judged of in the construction which we are called upon to give to the ninth, tenth and eleventh items of the will, and which items complete are as follows:

"Item 9.—It is my will and purpose, likewise by this my will, to secure to my dear daughter, Mary Ann Dolan, for the sole and separate use, benefit, enjoyment and behoof of herself and her lawful

issue during her life, and not in anywise to be at the control or dis-
posal of any husband she may have, or to be at all subject or liable
to his debts, or for his debts, contracts or liabilities, all of my other
property, of whatever kind or nature soever.    And with this view, I
give and bequeath all the residue of my estate, real and personal,
including six tenements and the ground on which they stand, situ-
ated on lot number 71, in said Columbus, and fronting on Crawford
and Front streets; also the tenement on the north side of Bridge or
Dillingham street, at the corner of said street with said Front street
(said tenement being on the west side of said Front street, the same
being the northwest corner of said crossing), including also all my
other, real estate not hereinbefore disposed of, and all my other per-
sonal property, bonds, notes, accounts, choses in action, claims or
demands of any description whatever, I give and bequeath said res·
idue to my said executor and to his successors, as my legal represen-
tatives in trust nevertheless, and with the special confidence to have
and hold the same, and the proceeds of the same, when realized in
money, to and for the sole and separate use, benefit, enjoyment and
behoof of my said beloved daughter and her lawful issue; said prop-
erty and proceeds not in anywise to be controlled, or to be at the
disposal of any husband she may have, or ever be or become subject
to or liable for his debts, contracts or liabilities.    I will and desire
my executor and his successors in said trust to retain in his and their
own hands the possession of said residue and its proceeds at least
until my said daughter shall arrive at full age, and control and man-
age the same, its rents, issues and profits, according to their best
judgment and discretion, for the best interest of my said daughter,
and the preservation and enhancement of my estate; and whenever
he shall deem it advisable for those purposes, before she arrives at
age or afterwards, and she thereto gives her consent in writing, I
hereby authorize and empower him or them, confirming said trust and
confidence, to purchase other real property, or sell said residue or any
portion thereof and invest the proceeds thereof, as well as its rents,
profits and issues, in other real estate, personal property or moneyed
securities, taking titles thereto to himself or themselves as trustees
aforesaid, with the like provisions for the sole and separate use, ben-
efit, enjoyment and behoof of my said daughter and her issue, and
not to be in the control or disposal of any husband she may have, or
be subject to or liable for his debts, contracts or liabilities.    It is
also, further confirming said trust, my will and desire, that out of the
income of said residue my said executor defray the reasonable and
proper charges and expenses for board, clothing, maintenance and
education of my said daughter until she arrive at full age, and that
said income, or a sufficiency thereof, shall afterwards be devoted to
the support and comfort of herself and her issue during her life, and
I do hereby appoint my said executor her guardian, with the trusts

and confidences hereinbefore expressed, and with the request that he will place her, when she shall have arrived at a suitable age, at some respectable Catholic seminary to be educated.

"Item 10.—It is my desire that my executor will, from time to time, with as little delay as possible, and as they shall be realized by him, proceed to invest, and continue to invest, all of the cash means of my estate and the income accruing therefrom for rents, interest, issues, profits, etc.—all that shall not be needed to meet the exigencies of the bequests hereinbefore made and the current disbursements herein directed—in other real property, such as stores on Broad street, in said Columbus, yielding reasonable rents and profits, or in some moneyed securities bearing interest, taking titles thereto in trust as aforesaid, and with the like limitations, for the sole, separate and independent use and enjoyment of my said daughter and her issue, and not to be at the disposal or control of any future husband of hers, or liable for his debts, contracts or liabilities.

"Item 11.—Upon the event of the death of my said daughter without child or children, or the issue thereof surviving her, I desire my said executor, or legal representatives, to sell all of said residue upon the best terms they can reduce the same to cash means, and from the proceeds thereof I give and bequeath to my dearly remembered mother, Bridget Dolan, one hundred dollars; to my brother, Bernard Dolan, three hundred dollars ($300); to my sister, Catherine Deignan, wife of said William Deignan, one hundred dollars ($100); to my sister, Anne, now in Ireland, one hundred dollars ($100)); and of the remainder, I give and bequeath two-thirds thereof to my said brother, Michael Dolan, and the other one-third I give and bequeath to my sister, Mary Grunan, and my sister, Bridget Flynn, both now in Ireland, to be shared equally between them."

To determine whether the decision of the court below was right or wrong, it is necessary for us to construe the will of Hugh Dolan as above quoted.

The first and cardinal rule for the construction of wills, and one which should never be lost sight of, is embodied in our Code in the following words:

"In the construction of all legacies, the court will seek diligently for the intention of the testator, and give effect to the same, as far as it may be consistent with the rules of law, etc. Code, §2456.

The intention is to be ascertained primarily from the will itself. That is generally the highest and best evidence of it. In most cases, it is the only evidence. The testator

having written his will, the writing is the exponent of his intentions, and if that is clear, if in the will itself, there is no ambiguity, it is solemnly obligatory upon the court, and it can resort nowhere else.   8 *Ga.*, 37.

To arrive at this intention, we are to look to the whole will, and construe each part in the light of every other part.   Looking then to the entire instrument before us, what was the intention of Hugh Dolan, as to the disposition of his property, as expressed in the three items above quoted?

Who are the objects of his bounty?   He had, at the time of making his will, a wife, a child, a mother, brothers and sisters.   All these are named in his will, and upon all of them he bestows some part of his goods.   There is nothing whatever in any part of his will to indicate any intention of disposing of his property in any unnatural or unusual way, but the whole scheme of the will, when considered altogether, shows a most reasonable, prudent, cautious and natural disposition of his estate.

His first care, after his burial and the payment of his debts, is a provision for his wife.   Then, after some small bequests to his mother and his brothers, he comes to provide for his only child, then a little girl about two years old.

For her he provides a trustee and guardian in the person of his chosen executor, his uncle, John McCarty.   To this trustee he bequeaths the residue of his estate, after the special legacies named in the foregoing items of his will; and as his wife died in the same year in which he died, this residue became at once his whole estate.

The provision for his child is preceded by this remarkable statement, clearly expressive of his intention as to her interest in his estate :

Item 9.—" It is my will and purpose likewise, by this my will, to secure to my dear daughter, Mary Ann Dolan, for the sole and separate use, benefit, enjoyment and behoof of herself and her lawful issue, during her life, and not in anywise to be at the control or dis-

posal of any husband she may have, or to be at all subject or liable to his debts, or for his debts, contracts or liabilities, all of my other property of whatever kind or nature soever."

By a slight transposition of the clauses of this sentence, as we are expressly authorized to do by section 2456 of the Code, the meaning becomes, if possible, more obvious. It will then read:

"It is my will and purpose likewise, by this my will, to secure to my dear daughter, Mary Ann Dolan, all my other property of whatever kind or nature soever, for the sole and separate use of herself and her lawful issue, during her life, and not in any wise to be at the control or disposal of any husband she may have, or to be at all subject or liable to his debts, or for his debts, contracts or liabilities."

Thus he expresses what his purpose, his will, his intention is, namely, to secure to his daughter his whole estate for the use, benefit and behoof of herself and her lawful issue during her life.

To effectuate this purpose, and with this view, he gave it to his executor in trust, to be held, controlled and managed for the best interest of his daughter, and the preservation and enhancement of his estate. His trustee was clothed with specific, plenary powers over both the *corpus* and the issues or profits of his estate, and the trust was to continue until the death of his said daughter.

Then come in the provisions of the 11th item of his will, which provides that,

"Upon the event of the death of my said daughter, without child, or children, or issue thereof, surviving her, I desire my said executor, or legal representatives, to sell all of said residue upon the best terms they can reduce the same to cash means," etc.

And to pay over his whole estate to his mother, his brothers and his sisters.

Now, since the contingency did not arise which, by the terms of the will, was to vest the estate in the mother, the brother and sisters of testator, according to the provisions of item eleventh, we are to determine what the testator intended should become of his estate upon the death of

his daughter, Mary Ann Dolan, she leaving at her death a living child, John McCarty Gaboury, the complainant.

What estate vested in Mary Ann Dolan at the death of the testator?

To answer this question necessarily involves an investigation of the legal principles deducible from that long line of adjudication concerning estates tail, remainders, reversions, and other kindred topics, which at once con-stitute the most abstruse and difficult part of all judicial investigations. We cordially adopt the utterance of the illustrious Judge Lumpkin when entering upon a similar investigation: "We lack the necessary time, had we the inclination and ability, to be raking in the ashes of anti-quated cases" (whose name is legion) on this abstruse point of black letter lore.

In the investigation of this case, however, we have care-fully studied, not only every case cited on the elaborate briefs of the distinguished counsel for both parties, but we have looked into all others from which we hoped to obtain the least light and assistance.

In the case of *Benton vs. Patterson*, 8 *Ga.*, 146, the court, Lumpkin, J., delivering the opinion, use this lan-guage: "Four tests have been applied by the courts for the purpose of ascertaining the nature of the estate in-tended to be created, and, notwithstanding the words of the instrument would *per se* be construed into a limita-tion, yet they will be held to be words of purchase, either where no estate of freehold is given to the ancestor, or where no estate of inheritance is given to the heir, or where a new inheritance is grafted on the words of entail, or lastly, where explanatory words are superadded." And in *Burton vs. Black*, 30 *Ga.*, 638, the court say, "The ques-tion, whether or not an estate tail is created, is always resolvable into two others, of which one is, what persons are intended to take the property? And the other is, do these persons constitute a class, having succession from generation to generation, down to the end of the blood?"

Now, applying these rules to the case before us, was an estate tail intended to be created? What persons are intended to take the property?

He gives it to his executor in trust, for the use, enjoyment, benefit and behoof of Mary Ann Dolan and her lawful issue. These words alone would doubtless create an estate tail, and by the act of 1821, a fee simple estate in Mary Ann Dolan.

But let us apply the rule as to superadded words, remembering that the rule in Shelly's case was made to effectuate the intention of testators, not to disappoint them, and that our own act of 1854 was in force at the time of making this will.

First, then, the will expressly provides that the estate given to his daughter and her lawful issue is to be for her life.

Secondly, upon her dying without child or children, or the issue thereof surviving her, the estate was to go over to his mother, brothers and sisters.

Do not these words more than clearly indicate that, by the words lawful issue, the testator meant such child or children of his daughter as she might have living at her death, and not an indefinite line of descendants?

Thirdly, the limitation over is to persons whom the testator could not have expected to be in life at a very remote period, since they were his mother, his brothers and his sisters.

And lastly, on this point, as observed by Judge Lumpkin in *Benton vs. Patterson,* from which we before quoted, " It can hardly be believed that the act to be performed here by the trustee, namely, the sale and distribution of the property to his relatives in Ireland, should his daughter die without child or children, or the issue thereof surviving her, could mean, in the mind of testator, whenever her descendants should become extinct, sooner or later, and without reference to any particular time or any particular event."

In Taylor *vs.* Taylor, 63 Penn. St., 481, and 3 American Reports, 565, Sharswood, J., delivering the opinion, uses the following language : " The word ' issue ' in a will means *prima facie* the same thing as ' heirs of the body,' and in general, is to be construed as a word of limitation, but this construction will give way if there be on the face of the in- strument sufficient to show that the words were intended to have a less extended meaning, and to be applied to chil- dren, or to descendants of a particular class, or at a partic- ular time." Again, in the same decision, " It is a position not open to dispute that, if it appears, either by expression or by clear implication, that, by the word ' issue,' the tes- tator meant ' children,' or issue living at a particular period, as at the death of the first taker, and not the whole line of succession, which would be included under the term, ' heirs of the body,' it must necessarily be construed to be a word of purchase, and the rule in Shelly's case can have no ap- plication." Again, in the same decision, "Where a limita- tion over to take effect, not on an indefinite failure of issue of the prior taker, but on a failure of children only, or on a failure of issue within a given time, then the limitation over will not raise an estate tail by implication in the first taker, but he will have a life estate, with a contingent re- mainder over, or a life estate, with a limitation over of a springing trust, or a fee with a conditional limitation over, as the case may be," and citing Smith on Executory In- terest, 301.

And lastly, from this most able and pointed decision : " Where a limitation is to a parent for life, and to his chil- dren by way of remainder, there seems to be no ground, whether there are children or not, for holding the parent to be a tenant in tail," and citing 2 Powell on Devises, and the distinguished judge adds, " It was accordingly so held by this court in Cote *vs.* Bonnharst, 5 Wright, 243 ; Lantz *vs.* Trusler, *Ib.*, 482 ; Haldeman *vs.* Haldeman, 4 *Ib.*, 29."

This precise doctrine, in reference to superadded words,

is again reiterated by Judge Sharswood, in Hill vs. Hill, 74 Penn. St., 173; American Reports, Vol. xv., 545. This whole doctrine of the effect of a limitation over upon the ancestors dying without issue, is fully discussed by Chancellor Kent in his Commentaries, and the same conclusions as hereinbefore stated are arrived at. See 4 Kent (ninth edition), page 306 to 311, inclusive, and cases therein cited.

But our own Supreme Court have time and again enunciated the same doctrine. 4 Ga., 52; 12 Id., 357; 30 Id., 224; 7 Id., 76; 62 Id., 142.

But it is insisted that in this case the testator made no express disposition of his estate, except in the event his daughter should die without leaving issue, which it is conceded she did not do; and further that no child or issue was in esse, and that therefore by the will a fee simple estate was conveyed to the daughter, and 68 Ga., 37, and 69 Id., 485 and 617, and Code, §2250, are cited as supporting this proposition. It is a sufficient reply that in both the cases cited in the 69 Ga., there were no superadded words to show that the maker of the instrument intended that the words used should be construed to be words of purchase and not of limitation, and in the case of Gibson vs. Hardaway, 68 Ga., 370, the testator did not make the bequest expressly for or during the life of his daughters, but conveyed the estate absolutely to them, subject to be divested, in case they died without child or children.

Furthermore, it will be noted that Judge Pottle, who decided this case in the court below, and whose opinion is adopted by the Supreme Court, expresses some doubt as to whether or not in that case the property devised would in law pass under the residuary clause. And Jackson, C. J., delivering the opinion, says: "The entire scheme seems clear to keep the property in the blood of the testator just as long as the law will permit, but no longer."

But as illustrating this point, we will quote again from Burton vs. Black, 30 Ga., 638, the words of Judge Stephens, which seem conclusive of this question:

v 47-10

"The cases which have caused such difficulty and conflict of decisions are those where the persons intended to take the property are to be ascertained, not by designation in the conveyance, but by inference. This inference is generally associated with a limitation over, the inference itself being that those are intended to take the property who are designated to prevent its going over. The inference is a sound one only when carefully applied and put under certain restrictions. There should be great care in adhering strictly to the description of the persons who are to prevent the property from going over; for whatever persons these may be, the only just inference is that those same persons, by the same description, are intended to take. If property is given to A for life, and if he shall die without issue, then over to B, the issue of A are the persons whose existence is to prevent the property from going over to B; and the just inference is that the 'issue,' without further description, are intended to take. This, then, is equivalent to a gift to A for life, remainder to his issue if any, and if none, then over to B. . . . . . . But if property is given to A for life, and if he shall die without issue living at his death, then over to B; the issue of A living at his death are the persons who are to prevent the property from going over, and the just inference is, that only such issue are intended to take it as shall be living at A's death."

Now, applying this test to the case before us, it is obvious from the words of the will that the testator intended to convey his estate, except what he had before disposed of, to his executor in trust for his daughter, Mary Ann Dolan, during her life; that if she should have a child or children, such child or children should be entitled to a support and maintenance out of said estate so long as their mother lived, and if they or any of them outlived her, such survivor should take the whole estate in fee, but if she, Mary Ann Dolan, should have no child or children, or if having borne such child or children, they should die be-

fore their mother, that is to say, if Mary Ann Dolan should die without a child or children or the issue of children surviving her, then that his estate should go to his relatives in Ireland. This intention is the more obvious from the fact that the will shows that the testator knew what an estate for life was; he had created one in his wife.

He knew what a reversion was; he had provided that, upon the death of his wife, the bequests to her should revert to his estate, and become a part of the residue thereof. He evidently intended not to die intestate as to any part of his property, for he hedged it all, with its rents, issues and profits, by the most carefully guarded expressions. He shows his idea of what should become of property in case the first taker should die by his bequest of the proceeds of his brother's note, namely, " to the education of his eldest son, or eldest surviving son, the lawful child of my said brother, if he should have any, and if not, then for the like education of the eldest surviving daughter of said Bernard."

Could anything be more patent than that testator intended his property to be kept in the hands of his own blood, just so long as the law would permit, but no longer? Is it not equally evident that he intended that the time fixed for his whole estate to vest in those whom he intended should take it, was the death of his daughter? Because he not only expressly declares, but he expected his mother, brothers and sisters to be in life at the time, and he had imposed a trust upon his executor which he intended that executor to execute. How is it possible to conclude that an indefinite failure of issue could have been contemplated by the testator, or that a remote period should have been fixed for the final vesting of his estate?

1. Therefore we conclude that the words, "lawful issue," when taken in connection with the explanatory superadded words used by Hugh Dolan in his will, are words of purchase and not of limitation.

2. That no estate tail was created by his will.

3. That a trust estate was vested in John McCarty, executor, and hence in defendant, for the use, benefit and behoof of Mary Ann Dolan during her life.

4. That this estate to her was subject to be opened upon the birth of a child to her, to let in such child, for a use, enjoyment, maintenance and support with its mother during her life.

5. That upon the death of the mother without a child, or the issue thereof, living at her death, the whole estate would have gone over to testator's mother, brothers and sisters.

6. That having left a child living at her death, the limitation over was defeated, and the absolute fee simple estate vested in the child.

7. That the trust in the defendant, William McGovern, became executed upon the death of Mary Ann Gaboury, she having left a living child.

8. That complainant takes the whole estate, not by inheritance from his mother, but by purchase, under the will of his grandfather, and a right of action having accrued to him, at the death of his mother, he is entitled to the relief he seeks. There is equity in the bill, and the judgment dismissing it on demurrer for want of equity was error.

Judgment reversed.