JOHN POURNELL and WIFE, plaintiffs in error, vs. DANIEL HARRIS, defendant in error.

[1.] A testator, by the sixth item of his will, made in the State of Virginia, in 1793, where he resided, made the following bequest: "I lend to my grand-daughter, Jincey Jordan, during her natural life, the use and services of the following slaves and their increase, to-wit: Edy, &c., (which said negroes I had lent to my son, Henry Haily, at my discretion,) and at her decease, I give the said slaves and their increase to the heirs of her body, lawfully begotten. But if she should die without such issue, in that case, I give the said slaves and their increase to my grand-children, Letitia and Richard Hyde Haily, aforementioned, or the survivor of them, and the heirs of their bodies, lawfully begotten. And in default thereof, then to my grand-sons, Henry and Hudson Haily, or the survivor of them, and their heirs forever."

*Held*, That Jincey Jordan took an estate tail in the negroes, which was enlarged by the laws of Virginia into an estate in fee *simple*.

[2.] That the word "*lend*," used in said clause, imports the same sense as "give," and is so to be construed.

[3.] That the gift of the *use* and *services*, in said item, carries the corpus of the property with the use.

Trover, from Washington county, Before Judge HOLT, at March Term, 1859.

This was an action of trover, by John Pournell and wife, and others, against Daniel Harris, for the recovery of certain negro slaves, claimed by the plaintiff under the sixth item of the last will and testament of James Haily, deceased, late of the State of Virginia, and which item is as follows, viz:

"*Item Sixth.* I lend to my grand-daughter, Jincey Jordan, during her natural life, the use and services of the following slaves and their increase, to-wit: Edy, Fortune, Rody, Ferri-by and Littice, (which said negroes I had lent to my son, Henry Haily, at my discretion,) and at her decease, I give the said slaves and their increase to the heirs of her body, lawfully begotten. But if she should die without such issue, in that case, I give the said slaves and their increase to my grand-children, Letitia and Richard Hyde Haily, aforementioned, or the survivor of them, and the heirs of their bodies, lawfully begotten. And in default thereof, then to my grand-

sons, Henry and Hudson Haily, or the survivor of them, and their heirs forever."

This will was executed in the State of Virginia, where the testator resided at the time of his death, and bears date 26th March, 1793.

The plaintiffs claimed the negroes, as remaindermen, under the said sixth item, being the " heirs of the body of Jincey Jordan, lawfully begotten."

At the trial, on motion of counsel for defendant, the presiding Judge ordered a nonsuit, on the ground that the sixth item of said will created an estate tail in Jincey Jordan, which, by the laws of the State of Virginia, was converted into a fee simple estate, and vested an absolute title to said slaves and their increase, in said Jincey.

Afterwards, counsel for plaintiffs moved to set aside the judgment of nonsuit, and to reinstate the cause, on the ground that the Court erred in the construction given to the sixth item of said will.

The Court overruled the motion and counsel for plaintiffs excepted.

Wm. S. Rockwell; and I. L. Harris, for plaintiffs in error.

John Schley; and Geo. A. Gordon, *contra.*

*By the Court.*—Lyon. J. delivering the opinion.

[1.] What interest or title did Jincey Jordan take in the negroes named in the sixth item of the will of James Haily, according to the laws of force in the State of Virginia, where the will was executed, and where the testator resided, and subsequently died in 1795? This is the question that this record presents for the adjudication of this Court; for by those laws, then in force in that State, must this Court be governed in construing and giving effect to this provision of that will.

By an Act of the Legislature of the State of Virginia, of 7th October, 1776, it is enacted, that " any person who now hath, or hereafter may have any estate in fee tail, &c., in any lands, and whether such estate tail *hath been* or *hereafter shall be* created by deed, will, &c., shall from henceforth, or from the commencement of such estate tail, stand *ipso facto* seized, &c., of such lands, &c., in full and absolute fee simple, in like manner as if such deed, will, &c., had conveyed the same in fee simple," &c. And by a revised Act of 1785, it is again enacted, "that every estate in land or slaves, which, on the 7th October, 1776, was an estate in fee tail, shall be deemed from that time to have been, and from that time to continue, an estate in fee simple. And every estate in lands which since hath been limited, or hereafter shall be limited, so that, as the law aforetime was, such an estate would have been an estate tail, shall also be deemed to have been, and to continue an estate in fee simple."

These are the statute laws of force in the State of Virginia, at the execution of this will, and by these laws, and the construction put on them by the Courts of Virginia, must the interest of Jincey Jordan in these negroes, under that will, be measured.

The Courts of Virginia, in determining what words in deeds or wills, made in that State since the passage of those Acts, create estates tail, and in construing and giving effect to the statutes themselves, have uniformly held, that they were bound by the same laws and rules of construction that prevailed in that State, and in the Courts of Great Britain, before the passage of the Act of 7th October, 1776, abolishing estates tail in that State, and converting them into estates in fee simple. *Jeggetts vs. Davis*, 1 *Leigh Rep.* 368; *Tate vs. Tully*, 3 *Call.* 354; *Eskridge vs. Fisher*, 1 *Hen. & Mum.* 559.

With a rule thus broadly defined, it would be an easy matter for us to determine what estate Jincey Jordan took in the property, under the will, even if the adjudication of the Courts of Virginia left room for doubt, but there can be no doubt; the cases are too numerous, and too directly in point.

In *Carter vs. Tyler*, 1 *Call.* 143, the will was made in 1759. Testator gave to each of two sons a tract of land, and to each devise was this limitation: "to him and his heirs lawfully begotten forever," "and if either of my sons should die without issue, my will is, that the whole go to the survivor; and if they both die without issue lawfully begotten, then my will is, after my wife's death, that the lands be sold, and the money thereon be equally divided between my daughters then living, and their heirs forever." In that case the Court held, that the sons took estates tail, and the limitations over were void. Judge Carr, of the Court of Appeals of Virginia, in *Bell vs. Gillespie*, and *Broaddus vs. Turner*, 5 *Ran.* 281 and 309, refers to the decision approvingly, and says that it was decided in 1797, thirty years previously to *Bell vs. Gillespie*, and the first case to be found in the books after the passage of the laws docking entails, by the unanimous opinion of the Court, consisting of Pendleton, Carrington, Lyon, Fleming and Roane—venerable and able men—who were actors in those eventful scenes which gave birth to these laws. The cause was argued with great learning and ability, by the most distinguished counsel then at the bar, who put forth all their strength to prove that the limitations over were not destroyed by the statute; and that decision has never been questioned since.

In *Eskridge vs. Fisher*, 1 *Hen. & Mun.* 559—will in 1784 —devise of land and *personal* estate to his son, and his heirs, and if he die without lawful heirs, to the grand-son of the testator—counsel insisted that as real and personal estate were devised by the same words in the same sentence, this case presented an important distinction; but the whole Court considering the case as settled, decided the estate of the first taker to be an estate tail.

In *Ball vs. Payne*, 6 *Ran.* 73, the words of the will in controversy ere: "At the death or marriage of my wife, I give unto my son, Cyrus Ball, *the use* of the remainder of my lands

that I possess in the county of Lancaster, during his life, and in case he should have heirs lawfully begotten, that he shall or may dispose of the said land to either, or amongst the said heirs as he shall think proper; but in case that my son should die without *such* heirs, then my will is, that the said lands be equally divided amongst my daughters." That case, and the one before this Court, are alike in many features—in the one case the *use* only of the land is given, in the other the *use* and *services* to the first taker; in the one case the limitation over is to the heirs lawfully begotten, and should the son die "*without such heirs,* then over," and in the other, the case before us, the limitation is "to the heirs of *her body* lawfully begotten," and "if she should die without *such issue,*" then over, making, where there is a difference, this case much the strongest. In that case, after ruling that this was a devise to Cyrus for life, the Court says, there is no doubt but that the son Cyrus would, under that will, take an estate tail, according to the doctrines of the English law, or by the law of Virginia enlarged into a fee. For we know, says the Court, that by the law, as it has long been settled, if an estate had been given to A. for life, then to the heirs or issue of A., and if he die without such issue, over, A. took an estate tail; and this the statute says shall be a fee. But if we say, that under the law dispensing with words of inheritance, (referring to the Act of 1785,) the heirs of the body of A. became purchasers, and take the fee, we prevent A's life estate from being enlarged into a fee tail, and thus withdraw it from the Act. This would be setting one clause of the same Act in direct opposition to another. This, too, would violate the rule laid down and steadily adhered to by this Court, *in all the cases which have come before it.* Now when it is understood that this argument of the Court of Appeals of Virginia, was made directly in reply to the position of counsel for the plaintiff in that case as in this, that, under the will of James W. Ball, the heirs of the body of Cyrus Ball, and grand-children of the testator, were the

Pournell et ux. vs. Harris.

immediate objects of the intended bounty of the testator, and were used by the testator as words of purchase, and not of limitation, and that the Court should consider a fee simple given to the heirs of Cyrus Ball, which they took as purchasers, and which would prevent the enlargement of the estate of Cyrus into a fee tail, the striking analogy between the two cases is most manifest and conclusive. The Court concluded that Cyrus Ball took an estate tail, which was converted by the Act into a fee. Upon the authority of the case of *Ball vs. Payne,* consistent with, and sustained as it is by a uniform and unbroken current of decisions in that State, from 1797 down to the present day, we are of the opinion that Jincey Jordan took an estate tail in the negroes mentioned in the sixth item of the will of James Haily, converted by the law of Virginia into an estate in fee simple; in other words, that the property mentioned in that item of the will, vested under the will absolutely in her.

Counsel for plaintiff referred to, and relied on, in support of a contrary construction, the cases of *Timberlake vs. Graves, Greshams vs. Greshams, James vs. McWilliams, and Cordle vs. Cordle,* 6 *Mum.* 174, 187, 301, 455; but in none of those cases was the rule, enforced in this case, denied or controverted, nor the authority of the cases we have referred to, and by which we have felt ourselves bound, doubted or disputed.

[2.] But it is insisted, that as the testator made use of the word "*lend*" instead of "*give*," that no gift was intended to Jincey Jordan, and that no estate in, or title to the property of any kind, vested in her; but that the interest she had in the property, was simply that of a loan, while the title to the property remained in the testator during his life; and after his death, and until the death of his grand-daughter, in his executors; and if this position was a sound one, it would make a grand difference in our judgment. But is the position a sound one? We think not. The words of the bequest are, *I lend to my grand-daughter, &c., during her natural life, &c.,* and at her decease, I give, &c. It would seem that as

the testator used the word *lend*, to express the interest that he intended his grand-daughter should take in the property, and the word *give* to carry the property from her to the heirs of her body, or in default of them to others, he had some purpose in doing so. What that purpose was does not clearly appear. It certainly was not that the word lend should have its appropriate signification, for a loan is a grant of a thing to another for a limited time, to be specifically returned *to its owner*. It implies that the dominion of the thing remains in the lender. Here the testator parts with his entire interest in this property. No further control of the property is left in him or his executors; that is gone from him and them forever. Between the expiration of the life interest of Jincey Jordan, and the taking of the remaindermen, there is not one instant of time, in which the executor of testator could resume the possession or dominion. How then can it be a loan? Had the testator, instead of saying "I lend," said "I give," what greater interest would Jincey Jordan have taken in the property, than she actually did, or than the testator intended she should take? The interest given, and intended *to* be given, then, not being a loan but a gift; it must be construed to mean the same as if the testator had said "I give," instead of "I lend." This word was before the Court of Appeals of Virginia, for construction, in the case of *Deane vs. Hanford*, 9 *Leigh*, 256, in the following clause: "I lend to Thos. Deane, and the heirs of his body." Here, the Court says, "there is no sound distinction between such a loan, and words imputing a gift," and that authority is conclusive upon us in this case.

[3.] It is insisted further, that the negroes were not the subject of the gift to Jincey Jordan, but that only the "*use and services*," while the negroes are given to the heirs of her body, and that is such a distinction as takes this case out of the rule.

We cannot agree with counsel for the plaintiff. We think that if there is a distinction, it is without a difference. This identical question was passed upon by the Court, *in Ball vs.*

*Payne*, 6 *Rand.* 73.    There the testator gave the *use* of the land to his son Cyrus, with power of appointment to the heirs of his body, if he had any, and the Court says, "the use of his land given to Cyrus in the first branch of the clause, and the power of appointment in the second, I do not consider as affecting at all the character of the devise."  But in the absence of any such adjudication in that case, can a case be found where, when the entire use and profits of a thing is given indefinitely, the thing itself does not follow the profits?

Judgment affirmed.

Judge STEPHENS having been of counsel in this case, previous to his eleva to the Bench, did not preside.