ELIZA C. WAYNE, plaintiff in error, *vs.* PROCTOR B. LAWRENCE, administrator, *et al.*, defendants in error.

1. An ante-nuptial settlement executed in Georgia, in July, 1821, whereby the intended wife conveyed her property, real and personal, to trustees, and to the heirs etc., of the survivors of them, in trust, for the use of herself, for and during the term of her natural life, and from and after her decease, then to the use of the heirs of her body, to be by her intended husband begotten, and in default of such issue, then to the use of herself or her intended husband (whichever might be the survivor) her or his executors, administrators and assigns, forever, was a conveyance expressed in such terms as that the same would, prior to the abolition of entails, have passed an estate tail in real property. Therefore, under the rule of construction prescribed and made uniform by the act of December 21st, 1821, the use which vested in the intended wife was an absolute, unconditional fee-simple estate, and the offspring of the marriage took nothing as purchasers.
2. The heirs of the body designated in the settlement, are not the common heirs of both consorts, but the heirs of the wife only.
3. Trusts not within the rule in Shelley's case, are those which are executory because some direction is to be obeyed before the limitations are complete, or because, though all the limitations are complete in substance, an actual conveyance is provided for.

Estates. Deeds. Before Judge TOMPKINS. Chatham Superior Court. November Term, 1875.

This was ejectment brought by Lawrence, as administrator of his deceased wife, Carrie M. Lawrence, formerly Pooler, daughter of Mary J. Pooler, and as guardian of his minor children by said wife, against Wayne, for a certain lot in the city of Savannah. The plaintiffs claimed as *remaindermen* under the following marriage settlement:

" STATE OF GEORGIA.

" This indenture tripartite, made this — day of July, in the year of our Lord one thousand eight hundred and twenty-one, and in the forty———— year of the independence of the United States of America, between Mary J. Wayne, of the city of Savannah, in the State of Georgia, of the first part, Robert W. Pooler, of the same place, attorney-at-law, of the second part, and Richard Wayne, of the same place, Esquire, and George W. Anderson, of the same place, merchant, of the third part. Whereas the said Mary J. Wayne, under and by virtue of the last will and testament of Richard Wayne, late of the city of Savannah, merchant, deceased, is entitled to certain property, portion of the estate of the said Richard Wayne, deceased ; and whereas a marriage is intended to be had, and by God's permission shortly to be solemnized between the said Mary J. Wayne and the said Robert W. Pooler, upon the contract of which said marriage the said Robert W. Pooler hath agreed that if the same shall take effect, then that, notwithstanding the said marriage, he, the said Robert W. Pooler, his heirs, executors, administrators or assigns, shall not and will not have any right, title or interest, at law or in equity, of, in or to, any such property, real or personal, as the said Mary J. Wayne is, or shall be, entitled to, under or by virtue of the said will, or otherwise, during the natural life of her the said Mary J. Wayne, but that the same shall remain in the said Mary J. Wayne for and during her natural life, and after her decease to the issue of said marriage, if any issue

there shall be. Now this indenture witnesseth, that the said Mary J. Wayne, by and with the advice, approbation and consent of the said Robert W. Pooler, her intended husband, in consideration of the premises and of five dollars to her in hand paid by the said parties of the third part, the receipt whereof is hereby in full acknowledged, hath granted, bargained, sold, aliened, remised, released, conveyed and confirmed, and by these presents doth grant, bargain, sell, aliene, remise, release, convey and confirm unto the said Richard Wayne and George W. Anderson, and the survivor of them, and the heirs, executors, administrators or assigns of such survivor, all and singular the property, real and personal, unto which the said Mary J. Wayne may be entitled under and by virtue of the said last will and testament of the said Richard Wayne, deceased, or unto which she is or may be entitled in any other manner, or by any other title whatever. To have and to hold all and every such property, real and personal, unto the said Richard Wayne and George W. Anderson, and the survivor of them, and to the executors or administrators of the survivor of them. In trust nevertheless to, for and upon the uses and trusts, conditions and limitations, following, that is to say, to and for the use and behoof of the said Mary J. Wayne, for and during the term of her natural life, and from and after her decease, then to the use and behoof of the heirs of the body of the said Mary J. Wayne by the said Robert W. Pooler to be begotten, and for and in default of such issue, then to the use and behoof of the survivor of them, the said Robert W. Pooler and Mary J. Wayne, his or her executors, administrators and assigns forever, and to and for no other use, intent or purpose whatsoever. And it is understood, covenanted and agreed, by and between the parties to these presents, that it shall and may be lawful and proper, to and for the said Richard Wayne and George W. Anderson, or the survivor of them, or the executors or administrators of such survivor, at any time hereafter, upon the request of the said Robert W. Pooler and Mary J. Wayne,

to grant, bargain and sell, all or any part of the property herein assured, or intended to be assured and conveyed, they, the said Richard Wayne and George W. Anderson, or the survivor of them, or the executors or administrators of such survivor, preserving, investing, settling and assuring the proceeds of any such sale upon the same uses, trusts, intents and purposes as are herein contained and expressed. And whereas, in and by the said last will and testament of the said Richard Wayne, deceased, the property therein devised and bequeathed unto the children of Richard Wayne (the eldest of whom is the said Mary J. Wayne) is not to be delivered until the youngest of the children of the said Richard Wayne arrives at the age of twenty-one years, it is covenanted, understood and agreed between the parties to these presents, that the said Robert W. Pooler and Mary J. Wayne, shall not, in any manner, apply for the property of the said Mary J. Wayne, or her portion of the estate of the said Richard Wayne, deceased, until the period at which the youngest child of the said Richard Wayne shall arrive at the age of twenty-one years, and that the said Robert W. Pooler and Mary J. Wayne, are not to demand, ask or call for, any of the rents, issues and profits thereof, or of any of the property of the estate of Richard Wayne, deceased, which has been under the management of the said Richard Wayne, with the permission of the executors of the said Richard Wayne, deceased. And it is covenanted and agreed by the said Robert W. Pooler and Mary J. Wayne, for themselves severally and jointly, and their, and each of their heirs, executors and administrators, that in case the said Richard Wayne, who now, with the consent of the executors of the said Richard Wayne, deceased, in behalf of his children, shall erect, or cause to be erected, any buildings on any part of such real estates, then that the said Robert W. Pooler and Mary J. Wayne, shall and will pay unto the said Richard Wayne the costs and charges of the same in an equal proportion with the rest of the children of the said Richard Wayne, within a reasonable time after a demand of the

same.   In witness whereof the parties to these presents have hereunto set their hands and seals the day and year aforesaid.

" MARY J. WAYNE,          [L.S.]
" ROBERT W. POOLER,          [L.S.]
" R. WAYNE,          [L.S.]
" GEORGE W. ANDERSON, [L.S.]

" Sealed and delivered in presence of
   " R. R. CUYLER, *Notary Public.*
   " ELIZA C. ANDERSON."

The defendant held under a sheriff's sale made by virtue of an execution against the wife, at which her title to the said premises was sold.   The sole question, therefore, was, whether the wife took an absolute estate in the property conveyed by such marriage settlement, or only a life estate, with remainder over to the offspring of the marriage.

The court held the latter to be the proper construction of the instrument, and judgment for the plaintiffs was accordingly entered.   To this ruling the defendant excepted.

HARTRIDGE & CHISHOLM; GEORGE A. MERCER, for plaintiff in error.

JOHN M. GUERARD, for defendants.

BLECKLEY, Judge.

We are in a court of law, not in a court of equity.   The action is ejectment, with no special allegations on which to adjudicate mere equitable rights, or found equitable relief. The property involved may or may not be the proceeds of property owned by Mrs. Pooler at the time of her marriage. The special verdict is silent on that point, and so is the entire record.   The deed applying directly to the premises in dispute, is one from the municipal authorities of Savannah, to the trustees of Mrs. Pooler, bearing date in 1831, ten years later than the marriage settlement.   That deed makes no reference to the settlement; neither does it mention the

children or issue of the marriage, or the heirs of the wife's body. In so far as it passes title at all, it simply conveys to the trustees, as trustees of Mrs. Pooler. It provides for a further conveyance, on certain conditions, to them, their heirs and assigns, to the only proper use and behoof of her and her heirs and assigns, forever, in fee simple. The record does not inform us whether this deed was made pending the coverture, or after it had terminated. Neither does it inform us whether or not Pooler survived his wife, or even whether he may not still be living. We cannot tell, therefore, whether the plaintiff's intestate was sole heir general of Mrs. Pooler, as well as the only heir of her body; nor can we tell whether she was the sole heir of Pooler himself, so as to succeed by the statute of distributions to whatever estate he may have had in the premises, if indeed he had any. It will thus be seen, that upon the face of the deed, the plaintiff's intestate had no title to the premises, and that further facts are wanting to give her exclusive title under the statute of distributions. Therefore, in the absence of any defense whatever, her administrator was not in a situation to recover the whole of the premises, if he could recover any part, without having recourse to the marriage settlement. His real claim is founded on the terms of that settlement, read in connection with the deed. His position is, that, although the deed passed no title to his intestate, yet the settlement did; that, by virtue of the settlement, she took a remainder in fee, as purchaser. It is true, the settlement, in its language, applies to future acquisitions, but there is a strong probability that there is an implied limit in time, so as to confine its effect to acquisitions made before the termination of the coverture. It is hardly reasonable that what Mrs. Pooler might acquire after the death of her husband, was to be controlled by the settlement. This consideration suggests that, unless it appeared, either that the property in controversy was paid for out of the settled estate, or was otherwise acquired while the coverture subsisted, the construction of the settlement, even if favorable on the general question, ought not to be

decisive of the plaintiff's right to recover.  How can a deed which provides for an estate in fee simple be cut down to a life estate by the terms of a prior instrument, without showing, affirmatively, that the two instruments have a necessary connection, and must needs operate together on the very property in question?

1. However, as in the court below the case was made to turn on a construction of the marriage settlement, and as no other topic received the attention of counsel in the discussion here, we proceed to an examination of that instrument.  The distinction between executory articles, contemplating a future settlement to make them fully effective, and a settlement, operating as a present conveyance, and intended to be final and complete, is well recognized.  Atherly on Mar. Set. 92, 117, 151; 2 Story's Eq. §983; 1. Ib. §160; 1 Fearne on Rem. 91, 92, 93, 98, 108; Hill on Tr. 329; Perry on Tr. §361; 7 S. & M. 799; 1 White & Tudor's Leading Cases in Equity, Am. Ed., 46, 62, notes to Lord Glenorchy *vs.* Bosville.  In a court of equity, as appears from most of the authorities just cited, marriage articles are among the most plastic of all legal materials. That court will sometimes mould out of them settlements different from those provided for by the letter of the articles. Completed settlements, on the other hand, are of a more rigid nature, and equity touches them less freely; yet, where they have been made in pursuance of articles, or where mistakes are apparent from recitals, etc., they will be reformed so as to accomplish the legal effect intended.  It is, nevertheless, to be observed that even a court of equity will not perform its work in favor of manifest intention by a process of violence or crushing.  It will not do by construction, what ought to be done by reconstruction or correction.  Though satisfied that a mistake has been committed, it will abide by a completed conveyance as the parties have made it, so long as there is no application to have it reformed.  Of course, a court of law, adjudicating strictly as such, will regard only the actual state of the conveyance

and the construction which it ought to receive in that state. Indeed, the party bringing in the instrument and asserting it as title, stands upon it as correct. What it gives him as it is, he claims; what it might give him as it is not, is a question which he does not present. The instrument now under consideration is not a minute of executory articles. It is a complete and final conveyance, in which the parties have given ultimate form and expression to their whole scheme, and established limitations to suit themselves. It contemplates no ulterior settlement by the trustees, or by a court of equity. In and by it, the intended wife conveys her property, real and personal, to trustees, and to the heirs, executors, administrators and assigns of the surviving trustee, "to, for and upon the uses and trusts, conditions and *limitations* following; that is to say, to and for the use and behoof of the said (intended wife) for and during the term of her natural life, and from and after her decease, then to the use and behoof of the heirs of the body of the said (intended wife), by the said (intended husband) to be begotten, and for and in default of such issue, then to the use and behoof of the survivor of them, the said (intended husband and wife), his or her executors, administrators and assigns forever, and to and for no other use, intent, or purpose whatsoever." A legal estate of inheritable freehold is manifestly conveyed to the surviving trustee, and though the instrument was made prior to our act of 1821, dispensing with words of inheritance to create a fee, the only words of inheritance introduced in connection with any of the uses declared, are "heirs of the body." In every case of marriage articles, or marriage settlement, there is, from the nature of the transaction, some degree of presumption that the parties intended a provision for children, as such. Moreover, that presumption is aided in the present instance by a preliminary recital, declaring that the intended husband has agreed, if the marriage shall take effect, that he, his executors, administrators or assigns, shall not, and will not, have any right, title, or interest, at law or in equity, in or to any

of the wife's property, real or personal, during her natural life, but that the same shall remain in her, for and during her life, and after her decease, to the issue of the marriage, if any issue there shall be. It is impossible to doubt that the estate in the wife was intended to be restricted to the period of her own life, and that, in the event of issue, they should succeed to the estate. But how succeed? This question is not answered in the recital, but is answered in the limitation to uses, above quoted, and in terms precisely appropriate to the creation of an estate tail. The wife, after passing a legal fee in trust, declares a use in herself for the term of her own life, and then a use for the heirs of her body to be begotten by the husband. This is the mode of providing for the issue that the parties adopted. We may be morally satisfied that they made a mistake in what they did; but we can see no reason for doubting that they did what they intended—only the true legal effect of their action was not contemplated or foreseen. Their intention was to provide for children by entailing the property. Their mistake was in supposing that they could secure the property to children in that way. When we consider the words of entailment they used, and that they failed to introduce anywhere, in connection with the equitable estate, the word heirs, except "heirs of the body," we can scarcely doubt that they had their minds upon an indefinite line of descendants, and thought they had settled the succession from generation to generation. The intention was to transmit the property throughout that line. None but heirs of the wife's body, by the husband begotten, were to succeed, as long as there should be such heirs in existence. The stream of blood was to be followed, and where it flowed, the estate was to go. Along the one narrow channel, it was to be washed down until blood failed. Under the authorities, we do not see that this construction is to be modified by the limitation over to the survivor of the parents. 20 Ga. 804; 17 Ib. 280; 2 Kelly 116. From numerous reported cases, we think the English courts of equity, when called upon to execute marriage articles or to

reform defective settlements, almost invariably construe "heirs of the body" as words of purchase for one purpose, namely, to make them (as meaning children), successive donees in tail, so as to give them the estate in strict settlement. This is done to promote, and not to obstruct, effective entailment. It makes the eldest son the first donee in tail, instead of the parent, and thereby prevents the parent from cutting off the entail; so that, at last, the words "heirs of the body," when applied to realty and used in articles or in a settlement, either create an estate tail, or go to provide for its creation. It is not improbable—indeed it is more than probable—that a court of equity in that country, would, on timely application, reform such a settlement as that with which we are now dealing, so as to put the estate tail in the children of the marriage, instead of in the wife. But until reformed, the conveyance would, we believe, be construed there as we construe it. When parties fail to convey in a way to give proper legal effect to articles, courts there do not disregard the conveyance actually made, or treat it as something else. Even courts of equity do not go to that extreme, but give relief, as we have before said, by reforming the conveyance, purging it of mistake.

2. Mr. Guerrard, the learned counsel for the defendant in error, citing 1 Preston on Estates, 344, 359, and 2 Ib. 441, contended that the rule in Shelley's case, could not be made to apply to the instrument now under consideration, because "the freehold is limited to one person, and the second limitation is to the heirs of the body of that person and of another, who are husband and wife, so that the persons designated as heirs are to be common heirs of their two bodies." If this statement correctly expounded the second limitation in the settlement before us, it would undoubtedly be conclusive in favor of the learned counsel's position. 1 Fearne on Rem. 38. But it does not. The limitation with which we are concerned, is to the heirs of the wife's body to be by the husband begotten; and these terms do not designate the common heirs of their two bodies, but the heirs of the

wife's body alone. 1 Fearne 39 ; Littleton § 28 ; 3 Har-
grove's Notes, Co. Lit. 26 b, notes 151, 152 ; 2 Powell on
Dev. 440, 441 ; 2 Jar. on Wills, 251, 252 ; 2 Durn. & East,
431 ; 8 Ib. 516 ; 7 Smedes & M. 799. It is clear, therefore,
that the heirs in whose favor the ultimate estate is limited
are those of the same person to whom the preceding estate
for life was limited, and none others. The conveyance is,
in this respect, as exactly within the rule in Shelley's case as
it is possible for any conveyance to be—*see the rule stated
in* 2 *Kelly* 316 ; 14 *Ga.* 553.

3. Another reason given by the learned counsel against
the application of the rule, concerns the nature of the trust.
He contended that the trust was executory, in such sense
as to render the rule inapplicable. There is a power in the
instrument, enabling the trustees, upon the request of both
consorts, "to grant, bargain and sell, all or any part of the
property, they preserving, investing, settling and assuring
the proceeds of any such sale upon the same uses, trusts, in-
tents and purposes as are herein contained and expressed."
This is a limited power to change and reinvest. It is a
power that could be exercised only during the joint lives of
the husband and wife, and was conferred to facilitate the
management and better enjoyment of the estate. Such a
power seems not unusual. 1 White & Tudor's L. C., Am.
Ed. 53, notes to Lord Glenorchy *vs.* Bosville. As long as
the power continued, the trust would be, in a certain sense,
executory. Indeed, in that loose sense, it would be execu-
tory as long as the legal title remained in the trustees. But
what is meant by an executory trust on which the rule in
Shelley's case will not operate, may be seen by consulting
the following authorities : 2 *Kelly* 320, 321 ; 3 *Ib.* 559 ;
Hill on Trustees 332, 333 ; 1 Perry on Trusts, § 359, 2
Story's Eq. § 983 ; 1 Fearne on Rem. 137, 140 to 144 ; 1
White and Tudor's L. C. (supra) 45. The authorities may
be said to lead to this result—that the rule is not applicable
if the trust be executory in either of two ways : first,
where some direction is to be obeyed before the limitations

are complete; and, secondly, where though all the limitations are complete in substance, there is a direction for an actual conveyance to be made to the persons described as heirs, or heirs of the body. In the former instance, the maker of the instrument either postpones the limitations until after some preliminary is arranged, such as the purchase of property, or else whispers them, as it were, to the trustee, leaving him to utter them aloud; in the latter, the utterance, though clear and distinct at first, is, for greater certainty, to be repeated in a formal and ceremonious manner—that is, a direction to convey is to become an actual conveyance. The instance with which we are now dealing, is not one in which the limitations are postponed or incomplete, nor one in which a conveyance to the heirs of the body is directed. The power given is to sell and to reinvest upon the same uses etc. There is no authority to vary the uses, or to create new ones, or to make more perfect those already declared. To ascertain the uses after reinvestment, as well as before, there is no occasion to look out of the original conveyance. In that one instrument all the uses are expressed, and fully expressed, not only in respect to the original property, but in respect to any other into which it might, under the power, be converted. To decide on the exact character and immediate effect of every limitation, there is no occasion to wait for any act to be performed by the trustees; and no act they could perform, in pursuance of the power, would make a better or more complete title in any person or persons than the original instrument confers.

Judgment reversed.