IN THE

# Supreme Court of Georgia,

## AT ATLANTA.

MARCH TERM, 1888.

PRESENT—L. E. BLECKLEY, . . . . . . . . CHIEF JUSTICE.
M. H. BLANDFORD, . . . . . . . . ASSOCIATE "
T. J. SIMMONS, . . . . . . . . . . ASSOCIATE "

## WILKERSON et al. vs. CLARK.[*]

A devise by a father to his married daughter, made and probated prior to the code, to-wit, in the year 1841, by which he gave to her an equal share with others of his children in his estate, "to her benefit during her life, but my will is that (her husband) have no control of her distributive share, but that it be and remain the property of the heirs of her body after her death," passed an absolute fee to the daughter in the lands allotted to her in distributing the estate; and her children took no interest by way of remainder, the words "heirs of her body," being, when used without qualifying or explanatory terms, before the code was adopted, words of limitation and not words of purchase.

July 11, 1888.

Wills. Estates. Remainders. Words and phrases Before Judge LUMPKIN. Pike superior court. April term, 1887.

Wilkerson et al. brought ejectment against Clark. The

---

[*] The first sixteen cases of this term (preceding the case of *Fogarty vs. The State*) were argued at the October term, 1887, and the decisions reserved. The next following forty-two cases (preceding the case of *Tanner vs. Huss*) were brought forward from the October term, under §4271 (a) *et seq.* of the code.

case was submitted to the presiding judge upon the following agreement as to facts : The will of Nathan Vincent (containing the item set out in the decision) was executed and admitted to probate in 1841. The land in dispute passed to Syrena Wilkerson under the will, and plaintiffs were her children. She died in 1884 or 1885. She sold the land, and defendant and those under whom he holds have been continuously in possession since that time, holding under her vendee.

The presiding judge rendered judgment for the plaintiff. Upon motion for a new trial, he set same aside, and the plaintiffs excepted.

J. F. REDDING and HALL & HAMMOND, for plaintiffs.

J. A. HUNT, for defendant.

BLECKLEY, Chief Justice.

This devise, made in 1841, was by a father to his married daughter. He gave to her an equal share with each of his other children in the general residue of his estate, and added, " to her benefit during her natural life, but my will is that (her husband) have no control of her distributive share, but that it be and remain the property of the heirs of her body after her death." That by this provision of the will, an estate of freehold was conveyed to the daughter, with the ultimate estate of inheritance to the heirs of her body, there is no dispute. Thus far both sides are agreed, and reduced to its final analysis, the sole question between them is whether the rule in Shelly's case applies ; the effect of its application being to raise an estate which would in England be an estate tail, but which in Georgia, by virtue of the statute, (Cobb's Dig. 169,) is an estate in fee simple. There could hardly be a more apt instance for the application of the rule. The very things are done which the rule contemplates, namely an estate of freehold is given to a person, and by the same instrument the ulti-

mate estate of inheritance is given to the heirs of the body of that same person. The appropriate technical words of entail are employed, and what the rule in Shelly's case undertakes to do is to determine the classification and effect of the same. According to the rule, they are to be treated as words of limitation and not words of purchase.

The contention here is, that though *eo nomine* the ultimate estate is given to the heirs of the body, it is not given to them as heirs, in the character of heirs, but as children, and these words, following words importing an estate for life in the daughter, are consequently words of purchase, not words of limitation. This is the very question which the rule solves and settles, unless there are explanatory words or clauses in the instrument which show affirmatively that the testator, though he expressed himself in legal language, did not use that language in a legal sense. Certainly, had he wanted to entail his property to the extent of this one share, he went about it in a right way, and did what would have accomplished his purpose, save for the hindrance of our prohibitory law as to such estates. He made a disposition which, *prima facie* at least, has all the constituents of an estate tail that he could supply, and which would be an estate tail if the law would do its part and vitalize it as such. This the law would not do, and for this reason alone no estate tail was created. It takes two to create an estate, even by the *ex parte* instrumentality of a last will and testament; it takes the testator and the law. Here the testator completed the workmanship of an estate tail, on his part, but the law declining to co-operate, that particular kind of estate was not generated. It is said that, though he adapted his work so exactly to the creation of an estate tail, he really had no such estate in contemplation, but meant that his words should be taken as words of purchase, words importing children of the first generation alone, and not also their children after them in indefinite succession to the end

of time, or failure of the blood. If he meant children in the literal and restricted sense, he could have said so with a single word, and one which was appropriate to his supposed purpose both legally and colloquially. Still it is not impossible that he may have used a phrase of four words, " heirs of her body," as the precise equivalent of the one word " children "; for, strange as it would seem, it is often done both in wills and deeds. That such was his purpose is said to be inferable, first, from the express exclusion of his daughter's husband, which, it is suggested, would have been needless had he intended an estate tail, as the bare entailment would have been an exclusion of the husband from participating in the inheritance, supposing the entailment to be effective. But observe, what is said of the husband is, that he " have no control of her distributive share," showing a design to create in the wife (testator's daughter) a separate estate, one free from the marital rights of her husband, and this object accounts fully for the presence of the clause respecting him. As our law stood at the date of this will, his marital rights, but for this or some such clause of exclusion, would or might have attached upon whatsoever estate his wife acquired. The will sought to exclude him, not only from the inheritance, but from control pending the coverture; both of which objects are quite as compatible with an estate tail as with any other. Indeed, one of them, the former, is essential to an estate tail, being involved in' the very nature of the estate, and therefore needing no express mention in the instrument seeking to create it. But the latter did need express mention, as without it, whether the estate in the wife was one for life, in fee or in tail, the marital rights would or might have attached. It follows that these words respecting the husband are not rendered superfluous by adhering to the general signification, rather than adopting a special and restricted signification for the terms " heirs of the body," as used in this will.

Another circumstance relied on is that other daughters

of the testator shared equally with this one in the testator's estate by the provisions of the will, and that their shares were given absolutely, without remainder, and without exclusion of or restrictions upon their husbands.    The argument is, that as the testator did not provide for keeping in the blood the shares of these other daughters, he had no such design respecting the share of this one.    He certainly had no general testamentary scheme embracing the entailment of his property, nor did he have any embracing the exclusion of husbands, or of heirs general, yet in this one instance he certainly excluded the husband and heirs general of the daughter.    Having deviated so far from the disposition made in behalf of other daughters, and having done so by using words appropriate to the generation of an estate tail, why should it be concluded that he did not intend such an estate for this daughter and her posterity, from the fact that he provided otherwise for the other daughters?    We think there is too much of guesswork in this reasoning to make it the basis of a legal judgment.    Too doubtful and uncertain is the theory of counsel, however stated, that the only purpose the testator had in discriminating amongst the daughters, was to hold off the husband of this particular daughter, and prevent the property from ever vesting in him.    We do not know whether that was his only purpose or not, since there is nothing in the will, apart from what he has said in the devise we are construing, to inform us.    But grant that such was his only purpose as an end, it would still leave the question whether his purpose as means to accomplish it, was not to do what he has done, that is, attempt to create an estate tail.    That he could have excluded the husband without giving the devise the color and charac teristics of an estate tail, is certain.    Then, how can we conclude, except by mere guess, that he hit upon an apparent entailment by mistake rather than by design?    The truth is, that any possible doubt about the matter grows out of the failure of the estate tail to take effect as such.

If the law would let the devise have effect as it is written, the title under it to a fee tail would be impregnable. It would be upheld in any court in any country where the rule in Shelly's case is recognized and administered.

Lastly it is urged that the testator, having given by the will two small pecuniary legacies, one to the "lawful heirs" of a brother, the other to a sister "if living, or her lawful heirs if she be not alive," he certainly used "heirs" as synonymous with children in these bequests; whence it follows that he also used "heirs of the body" in a like sense. If he meant children by the terms "lawful heirs," as he possibly did, though that is not more but rather less certain than our main question, why he should have changed his vocabulary to "heirs of the body" if his meaning was unchanged, is not easily accounted for. If in his mind three sets of immediate children, and they only, were in contemplation, why did he call two of them "lawful heirs" and one of them "heirs of the body"? True enough, he might have done this, but did he do it? Do or can we know it well enough to escape from a rule of law so well-settled as the rule in Shelly's case and so directly in point?

We have gone over all the provisions of the will which were relied upon in the argument to supply qualifying or explanatory words for a reduced interpretation of the words of entail, and in none of them separately, nor in all together, can we discover the slightest reason for adopting the construction contended for. We have felt bound, in good faith, to try this will by the law as it existed prior to the adoption of the code, for that is the law applicable to it, and the new provisions of the code should have no influence on the decision. The code, by sections 2248, 2249 and 2250, abrogates the rule in Shelly's case, wipes it out utterly as a rule of law in limitations over, but this is only as to conveyances executed since the code went into effect, that is, since the year 1862. Prior to 1863, the terms, "heirs of the body," when used in conveyances, unless

modified or controlled by qualifying or explanatory words, were words of limitation, not words of purchase. The code, by §2250, leaves them still words of limitation, where no less estate than the fee is expressed, and where they are used not by way of limitation over, but of direct and immediate limitation of the estate granted. When they take effect as words of limitation, they do so as they did prior to the adoption of the code, under the act of 1821, and pass not a fee tail but a fee simple. The limitation power of the terms, " heirs of the body," is neither more nor less than that of " heirs," but just the same. Legally, they mean heirs general, both under the code and the act of 1821. The difference is, that under the code they are taken as words of limitation only in the one instance, that is, where they apply directly to the estate granted. It may be suggested, I think, as universally true, that whenever these words can be treated under the code as words of limitation, they are superfluous; and the same may be said of the word " heirs." Any word or words which import a fee simple can have no effect upon the conveyance as to the quantity of the estate, but the conveyance will pass the fee without, as effectually as with them; for save when a less estate is expressed, the fee always passes, and if a less is expressed, it cannot be enlarged by construction. Code, §2248.

We deem it unnecessary to fortify our conclusion by analyzing the authorities cited by counsel, though we have not failed to examine them before deciding the question. The volumes and pages, omitting the names of cases, are as follows :

Cited for plaintiffs in error: 1 Pere Wms. 387 ; 7 *Ga.* 76 ; 8 *Ga.* 146, 387 ; 14 *Ga.* 548 ; 15 *Ga.* 123 ; 16 *Ga.* 617 ; 20 *Ga.* 826, 832 ; 28 *Ga.* 260 ; 30 *Ga.* 226, 496, 638 ; 31 *Ga.* 733 ; 46 *Ga.* 596 ; 58 *Ga.* 19, 28, 260 ; 69 *Ga.* 485, 617 ; 73 *Ga.* 215 ; 74 *Ga.* 142.

Cited for defendant in error: 1 *Ga.* 182 ; 3 *Ga.* 556 ; 7

*Ga.* 76, 538; 12 *Ga.* 357; 14 *Ga.* 548; 16 *Ga.* 613; 20 *Ga.* 424, 699; 21 *Ga.* 378; 29 *Ga.* 736; 30 *Ga.* 224, 638; 48 *Ga.* 596; 58 *Ga.* 15; 69 *Ga.* 485; 71 *Ga.* 753; 74 *Ga.* 133. Judgment affirmed.